IN THE SUPREME COURT OF THE STATE OF DELAWARE

ELIJAH REGISTER,            §
                           §    No. 396, 2023
   Defendant Below,         §
   Appellant,               §    Court Below—Superior Court
                           §    of the State of Delaware
   v.                       §
                           §    Cr. ID. No. 2209010456 (N)
STATE OF DELAWARE,          §
                           §
   Appellee.                §

Submitted: October 9, 2024
Decided: December 19, 2024

Before **SEITZ**, Chief Justice; **VALIHURA**, **TRAYNOR**, **LEGROW**, and **GRIFFITHS**, Justices, constituting the Court *en Banc*.

Upon appeal from the Superior Court of the State of Delaware. **AFFIRMED.**

Santino Ceccotti, Esq., Office of Defense Services, Wilmington, Delaware, *for Appellant Elijah Register.*

John R. Williams, Esq., Delaware Department of Justice, Dover, Delaware, *for Appellee State of Delaware.*

**GRIFFITHS**, Justice, for the Majority:

On September 21, 2022, police were surveilling a known drug dealer in the middle of the afternoon in a high-crime area. Police knew that the drug dealer had conducted drug transactions in convenience store parking lots in the past. On this day, the drug dealer arrived at a Wawa in a car driven by his girlfriend and parked at the gas pumps. The dealer exited the car and stood near the pump. The defendant then approached the drug dealer on foot. The two conversed briefly. After that interaction, the drug dealer had his girlfriend exit the car so that he could sit in the driver's seat. Once seated, he reached under the driver's seat for several seconds, and then exited the car and returned to the defendant. The two men engaged in a brief hand-to-hand exchange and then both departed the Wawa. Although police did not see what was exchanged, they believed that they had just witnessed a drug transaction and therefore stopped the defendant. As the defendant was placed in handcuffs, he told police that he had a firearm in his bag. Police found the firearm but did not find any drugs. The defendant was arrested for illegally possessing the gun.

The defendant was charged with carrying a concealed deadly weapon and possession of a firearm with a removed, obliterated or altered serial number. The defendant moved to suppress the evidence, arguing that police lacked reasonable articulable suspicion to stop him. The trial court denied that motion, finding that

police had reasonable articulable suspicion to stop the defendant because they believed that he and the drug dealer had engaged in a hand-to-hand drug transaction. The defendant was subsequently found guilty on both counts. He now appeals the trial court's denial of his suppression motion.

Because we find that the trial court's factual findings were supported by sufficient evidence, we adopt those findings. Additionally, based on the totality of the circumstances, we find that the facts, combined with experienced officers' subjective interpretation of those facts, establish that police had reasonable articulable suspicion to stop the defendant because they believed that he engaged in a hand-to-hand exchange—consistent with a drug transaction—in a Wawa parking lot with a drug dealer known to sell drugs in convenience store parking lots. As the trial court noted, the defendant's only route through his predicament was if police lacked reasonable articulable suspicion to believe that the defendant had just committed a crime. We disagree with our dissenting colleagues that the defendant has "successfully navigated this route." We therefore affirm.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

### A.    Events Leading to Defendant's Seizure[1]

On the afternoon of September 21, 2022, members of the Safe Streets task force were actively patrolling a Targeted Analytical Policing System, or "TAPS," area along Route 13 in New Castle County.[2]  On that day, Detective Witte, a member of the task force, was surveilling Khaalid Lopez—a man known to police as a suspect in a previous drug investigation and who had been observed previously attempting to solicit drug sales through social media.[3]  Despite his status as a person prohibited from possessing a firearm, Lopez also had been observed previously in possession of firearms.[4]  Detective Randazzo, a member of the task force surveilling Lopez on September 21, confirmed that Lopez was known to the Safe Streets team based on past interactions.[5]  Detective Randazzo testified that Lopez "likes to meet at different convenience stores" to conduct illegal drug sales.[6]

---

[1] Unless otherwise noted, we derive the facts surrounding Defendant Elijah Register's stop and subsequent arrest from the transcript of the hearing on Register's motion to suppress.  Two witnesses testified during the hearing—Detective Anthony Randazzo and Detective Kenneth Guarino.  Both are employed by the New Castle County Police Department and are assigned to the Safe Streets task force.  Additionally, we have reviewed a body-worn-camera video that depicted part of the interaction between Register and police.

[2] App. to Opening Br. at A32, A34 (Det. Randazzo Test.).  According to Detective Randazzo, a TAPS area is "one and the same" as a high-crime area.  *Id.* at A33 (Det. Randazzo Test.).

[3] *Id.* at A35–37 (Det. Randazzo Test.).

[4] *Id.* at A36 (Det. Randazzo Test.).

[5] *Id.*

[6] *Id.* at A80 (Det. Randazzo Test.).

4

On September 21, Detective Witte observed Lopez get into a white Hyundai driven by his girlfriend, Nevaeh Moore, and head toward a Wawa located at 4000 North Dupont Highway in New Castle.[7] Detective Randazzo testified that he and his team had previously conducted drug and firearm investigations and made arrests stemming from that Wawa.[8] Detective Randazzo further testified that although Lopez was known to conduct drug sales at convenience stores, he was not known to sell drugs at this particular Wawa.[9] Moore drove to the Wawa with Lopez in the passenger seat.[10] Detective Witte saw the Hyundai pull up to a gas pump at the Wawa.[11] As he surveilled Lopez, Detective Witte apprised Detective Randazzo and the other Safe Streets members of the Hyundai's movements.[12]

After Lopez arrived at the Wawa, Detective Randazzo pulled up in an unmarked car and parked at a gas pump.[13] He saw that Lopez had exited the Hyundai and was standing at its rear, near its gas tank's fill spout.[14] To orient, Detective Randazzo had parked his unmarked car at a pump diagonally across from the

---

[7] *Id.* at A31, A37–38 (Det. Randazzo Test.).

[8] *Id.* at A32 (Det. Randazzo Test.).

[9] *Id.* at A80 (Det. Randazzo Test.).

[10] *Id.* at A37 (Det. Randazzo Test.).

[11] *Id.*

[12] *Id.*

[13] *Id.* at A37–38 (Det. Randazzo Test.).

[14] *Id.*

Hyundai.  Although Detective Randazzo's view of the Hyundai was unobstructed, his view of Lopez, who was at the far-side rear of the Hyundai, was partially obstructed by the Hyundai.  Detective Randazzo could not see whether Lopez was pumping gas or not.[15]  During this time, Moore remained in the Hyundai's driver seat.[16]

A "short time" after Detective Randazzo arrived at the Wawa, he "observed a black male who was wearing a white tank-top style shirt and a black fanny pack"— later identified as Defendant Elijah Register—walk up to Lopez at the rear of the Hyundai.[17]  Once Register reached Lopez, the two "had a very brief conversation."[18] Lopez then walked along the driver's side of the Hyundai to the driver's door, Moore exited the car, and Lopez sat in the driver's seat.[19]  While in the driver's seat, Detective Randazzo observed Lopez "reach underneath the seat for several seconds."[20]  Lopez next exited the driver's seat and walked directly to Register who was still at the rear of the Hyundai.[21]  Detective Randazzo testified that he saw both men put their hands out toward one another, and that "there was some kind of

---

[15] *Id.* at A38 (Det. Randazzo Test.).

[16] *Id.*

[17] *Id.* at A38–39 (Det. Randazzo Test.).

[18] *Id.* at A39 (Det. Randazzo Test.).

[19] *Id.*

[20] *Id.*

[21] *Id.* at A40–41 (Det. Randazzo Test.).

6

exchange."[22]  Although he could not see what was exchanged,[23] Detective Randazzo "observed what [he] believed to be a hand-to-hand" drug transaction between Register and Lopez.[24]  The two then immediately parted ways—Lopez got back into the Hyundai and Moore drove away, while Register walked away on foot.[25] Throughout his observations, Detective Randazzo relayed the above information to other task force members, including Detective Guarino.[26]

Detective Guarino arrived at the Wawa after Detective Randazzo established his surveillance position.[27]  Like Detective Randazzo, Detective Guarino saw Lopez exit the driver's side of the Hyundai, walk to the rear of the car, "have some sort of interaction with" Register, get back into the Hyundai, and then part ways.[28] Detective Guarino did not see what was exchanged.[29]

After Register and Lopez left the Wawa, Detective Randazzo proceeded to assist with stopping the Hyundai.[30]  Detective Guarino, Detective Witte, and another

---

[22] *Id.* at A40 (Det. Randazzo Test.).

[23] *Id.* at A41 (Det. Randazzo Test.).  The windows in Detective Randazzo's car were rolled up during the relevant time, so he was not able to hear any part of the conversation between Lopez and Register.  *Id.* at A40 (Det. Randazzo Test.).

[24] *Id.* at A64 (Det. Randazzo Test.).

[25] *Id.* at A42 (Det. Randazzo Test.), A85–86 (Det. Guarino Test.).

[26] *Id.* at A42 (Det. Randazzo Test.).

[27] *Id.* at A85 (Det. Guarino Test.).

[28] *Id.* at A85–86 (Det. Guarino Test.).

[29] *Id.* at A86 (Det. Guarino Test.).

[30] *Id.* at A42 (Det. Randazzo Test.).

member of the Safe Streets task force, Probation Officer McHugh,[31] were tasked with stopping Register.[32] Detective Guarino's body-worn-camera video showed Probation Officer McHugh placing handcuffs on Register as Detective Guarino approached. Register was stopped by police a few paces from the Wawa property. While placing handcuffs on Register, Probation Officer McHugh asked Register if he had a weapon on him. Register responded, "Yes." Detective Guarino then asked if the weapon was in Register's bag that was slung over his shoulder. Again, Register responded, "Yes." Detective Guarino placed the bag on the ground, opened it, and found a firearm. He later testified that the firearm had a serial number that "was scratched out."[33] Upon request, Register provided his name to police, and then he was arrested. Police did not find drugs on Register.

## B. The Superior Court Suppression Decision and Trial

Register was indicted for carrying a concealed deadly weapon and possession of a weapon with a removed, obliterated or altered serial number.[34] Register moved to suppress evidence found after he was detained, asserting that police lacked reasonable articulable suspicion to believe that Register was engaged in criminal

---

[31] *Id.* at A93 (Det. Guarino Test.).

[32] *Id.* at A85 (Det. Guarino Test.).

[33] *Id.* at A88 (Det. Guarino Test.).

[34] *Id.* at A4–5 (Grand Jury Indictment).

activity when Probation Officer McHugh stopped him.[35]  In response, the State

contended that police had reasonable articulable suspicion because they possessed

objective facts, paired with their subjective interpretations of those facts, that were

indicative of criminal activity.[36]  The State noted:  "it was a high crime area, [Lopez]

was a known drug dealer, [Register] interacted with him for less than a minute, and

[Lopez] then entered his vehicle to retrieve an unknown object, and Detective

Randazzo's observation of a hand to hand transaction."[37]

On July 21, 2023, the Superior Court held a hearing on Register's motion to

suppress.  Detectives Randazzo and Guarino testified during the hearing and the

parties presented argument to the court.  The State argued that the facts were

sufficient to find reasonable articulable suspicion under Delaware law.[38]  Register

emphasized that police never actually saw anything exchanged between the two

---

[35] *Id.* at A6–10 (Register's Motion to Suppress).  Register also argued that he was subjected to a custodial interrogation and certain statements were obtained in violation of his constitutional rights.  *Id.* at A10–11 (Register's Motion to Suppress).  This issue is not on appeal because the State conceded below that it would "not seek to admit any statement made by [Register] after he invoked his *Miranda* rights."  *Id.* at A20 (State's Response to Motion to Suppress); *see also* Ex. A to Opening Br. at 5 [hereinafter *Superior Court Order*] (finding this argument point moot).

[36] App. to Opening Br. at A19 (State's Response to Motion to Suppress).

[37] *Id.* at A17 (State's Response to Motion to Suppress).

[38] *See id.* at A98–99.

men.[39]  At the end of the hearing, the Superior Court took the motion under advisement.[40]

On September 26, 2023, the Superior Court issued an order denying Register's motion.[41]  The Superior Court found that Register had unfortunately "blundered into an ongoing criminal surveillance of [Lopez].  [Lopez] was a drug dealer known to the police and known to deal drugs in parking lots of convenience stores, albeit not this particular parking lot of this particular convenience store."[42]  The Superior Court also found that Register "appeared at the pumps and engaged in a 'hand to hand' transaction of some type" with Lopez.[43]

Next, the Superior Court determined that police seized Register for Fourth Amendment purposes when Probation Officer McHugh approached Register and stopped him for questioning.[44]  Regarding the officers' reasonable articulable suspicion to detain Register at that point, the Superior Court stated:

> It is surely true that not every apparent hand to hand transaction warrants police stopping the parties to inquire further about what just happened.  There may indeed be such transactions that raise no suspicions whatsoever.  Here, however, the drug dealing suspect [Lopez] was known to sell drugs in the parking lot of convenience

---

[39] *See id.* at A113–16.

[40] *Id.* at A123.

[41] *See Superior Court Order*.

[42] *Id.* at 1.

[43] *Id.* at 1–2.

[44] *Id.* at 2.

10

stores, he was under active surveillance, and [Register]'s conduct was consistent with a drug transaction. Proof beyond reasonable doubt? Probably not. But certainly within the bounds of a reasonable articulable suspicion to at least stop [Register] briefly and detain him long enough to allay law enforcement's concerns that he had not just committed a criminal act. Because [Register] told them he had a firearm in his backpack, he gave them all the additional information they needed to seize the gun and charge him with an offense. [Register]'s admission saves us the trickier question [of] whether police could search [Register]'s backpack without further information.[45]

On October 10, 2023, the Superior Court held a one-day bench trial and found Register guilty on both counts.[46] The same day, the Superior Court sentenced Register to ten years of incarceration suspended for 12 months of decreasing levels of probation.[47] Ten days later, Register filed this appeal.

### C. Contentions on Appeal

On appeal, Register contends that the Superior Court committed reversible error when it denied his motion to suppress because police lacked reasonable articulable suspicion to stop him. Register argues that the only set of objective facts that police observed was a "handshake with a person of interest at a Wawa in broad

---

[45] *Id.* at 3–4 (citing *Hall v. State*, 981 A.2d 1106, 1110 (Del. 2009); *Hudson v. State*, 23 A.3d 865, 2011 WL 2651089, at *5 (Del. July 6, 2011) (TABLE); *State v. Watson*, 2015 WL 2210343, at *3 (Del. Super. May 8, 2015)).

[46] *See* App. to Opening Br. at A2–3 (Superior Court Docket).

[47] Ex. B to Opening Br. at 1–2 (Sentence Order).

11

daylight."[48] Further, Register maintains that, at the time he was stopped, police had no information specific to Register linking him to suspicion of a crime.[49]

The State contends that the Superior Court's decision should be affirmed because its factual findings were supported by competent evidence and are not clearly erroneous, and under the totality of the circumstances, police had sufficient objective facts, paired with officers' subjective interpretations of those facts, to find reasonable articulable suspicion to stop Register.[50]

## II.    STANDARD OF REVIEW

This Court applies a mixed standard of review to a trial court's decision denying a motion to suppress evidence after an evidentiary hearing.[51] "We review findings of fact for clear error."[52] "Once the historical facts are established, the legal issue is whether an undisputed rule of law is violated. Accordingly, this Court reviews *de novo* whether police possessed reasonable articulable suspicion to stop a person."[53]

---

[48] Opening Br. at 8.

[49] *Id.* As drawn out during oral argument, Register's counsel argued that any facts about Lopez and his conduct cannot be imputed to Register for the reasonable articulable suspicion analysis because the analysis must be "individualized."

[50] Answering Br. at 14–15.

[51] *McDougal v. State*, 314 A.3d 1077, 1086 (Del. 2024); *Garnett v. State*, 308 A.3d 625, 641 (Del. 2023).

[52] *Garnett*, 308 A.3d at 641.

[53] *McDougal*, 314 A.3d at 1086 (quoting *State v. Rollins*, 922 A.2d 379, 382 (Del. 2007)).

# III. ANALYSIS

As explained below, we find that the Superior Court's factual findings were supported by sufficient evidence and not clearly erroneous. We also find that, under a *de novo* standard, police had reasonable articulable suspicion to stop Register after he interacted with Lopez. We therefore affirm the Superior Court's denial of Register's motion to suppress.

## A. The Superior Court's factual findings are not clearly erroneous.

To the extent that the trial court bases its decision to deny a motion to suppress on factual findings, we review those findings for abuse of discretion.[54] We must accept those factual findings "as long as there is sufficient evidence in the record to support them and the findings are not clearly erroneous."[55] "As a general matter, we will not disturb a trial judge's factual findings if they are supported by competent evidence, especially when they are based on the credibility of a witness."[56]

In its order, the Superior Court found that Lopez "was a drug dealer known to the police and known to deal drugs in parking lots of convenience stores, albeit not

---

[54] *State v. Abel*, 68 A.3d 1228, 1232 (Del. 2012); *Edgar v. State*, 173 A.3d 1061, 2017 WL 5501314, at *1 (Del. Nov. 14, 2017) (TABLE).

[55] *Abel*, 68 A.3d at 1232; *Lopez-Vazquez v. State*, 956 A.2d 1280, 1285 (Del. 2008); *see also Abel*, 68 A.3d at 1232 ("[The trial court's] factual findings can be based upon physical evidence, documentary evidence, testimonial evidence, or inferences from those sources jointly or severally." (internal quotation marks and citation omitted)).

[56] *Edgar*, 2017 WL 5501314, at *1; *Brank v. State*, 528 A.2d 1185, 1188 (Del. 1987) (citing *Martin v. State*, 433 A.2d 1025, 1033 (Del. 1981) ("This Court will not disturb conclusions of fact made by the trial court when supported by competent evidence.")).

13

this particular parking lot of this particular convenience store."[57]  The Superior Court further found that Lopez was "under surveillance [] in a Wawa store parking lot, apparently getting gas.  While so engaged, [Register] appeared at the pumps and engaged in a 'hand to hand' transaction of some type."[58]

The record contains sufficient, competent evidence to support these factual findings.  Detective Randazzo testified that Lopez was known by police because he was a suspect in a previous drug investigation, and that he had been "seen several times attempting to solicit the sale of narcotics through social media."[59]  In response to the trial judge's question of whether Lopez was known to sell drugs at this specific Wawa, Detective Randazzo testified that Lopez was not, but he did "like[] to meet at different convenience stores [in] different areas."[60]  With this testimony, the Superior Court had sufficient evidence to find that Lopez was known to sell drugs in parking lots of convenience stores, but not this specific Wawa.  Additionally, the

---

[57] *Superior Court Order* at 1.

[58] *Id.* at 1–2.  During argument, Register's counsel stated that Lopez was in fact pumping gas at the Wawa.  But the record is not clear on whether Lopez was pumping gas.  Detective Randazzo testified that he "wasn't able to see if there was a pump in the car at the time."  App. to Opening Br. at A38 (Det. Randazzo Test.).  And the Superior Court did not make this factual finding; instead, the Superior Court stated that Lopez was "apparently getting gas."  *Superior Court Order* at 1.  The record does not support Register's counsel's statement that Lopez was indeed pumping gas while parked at the pumps.

[59] App. to Opening Br. at A35–36 (Det. Randazzo Test.).

[60] *Id.* at A80 (Det. Randazzo Test.).  Detective Randazzo further testified that during a previous investigation, Lopez requested to meet at a Texas Roadhouse.  *Id.*

14

testimony of Detectives Randazzo and Guarino established that Safe Streets members were surveilling Lopez's movements on the day of Register's arrest.

Detective Randazzo further testified that after Register approached Lopez and the two interacted briefly, Lopez proceeded to the driver's side of the Hyundai where he sat in the driver's seat, reached under the seat for several seconds, exited the car and walked directly to Register "and put his hand out."[61]  He also testified that Register "placed his hand out, and there was some kind of exchange there."[62]  Detective Randazzo stated that he believed the exchange was "a hand to hand" transaction.[63]  On cross-examination, defense counsel asked whether the exchange could have "just been, like, shaking his hand or something?"[64]  Detective Randazzo said that "[i]t could have been" because "it's consistent with a hand-to-hand transaction."[65]  Although the detective acknowledged that shaking hands was a possibility, the Superior Court credited Detective Randazzo's other statements and found that Lopez and Register engaged in a hand-to-hand transaction that "was consistent with a drug transaction."[66]  Detective Randazzo's testimony was

---

[61] *Id.* at A40–41 (Det. Randazzo Test.).

[62] *Id.* at A41 (Det. Randazzo Test.).

[63] *Id.* at A64 (Det. Randazzo Test.).

[64] *Id.* at A67 (Det. Randazzo Test.).

[65] *Id.*

[66] *Superior Court Order* at 3–4 ("Here, however, the drug dealing suspect was known to sell drugs in the parking lot of convenience stores, he was under active surveillance, and [Register]'s conduct was consistent with a drug transaction.").

15

sufficient, competent evidence, and the Superior Court's conclusion that the testimony was credible is not one that we will disturb on appeal.[67] We find no clear error.

## B. Police had reasonable articulable suspicion of unlawful activity to stop Register.

### 1. The Law of Reasonable Articulable Suspicion

"An individual's right to be free of unlawful searches and seizures in Delaware is secured by two independent, though correlative sources."[68] This Court has stated that the Fourth Amendment to the United States Constitution "protects the citizenry from unwarranted governmental searches and seizures."[69] Similarly, Article I, § 6 of the Delaware Constitution provides that "[t]he people shall be secure in their persons, houses, papers and possessions, from unreasonable searches and seizures."[70] "Under the exclusionary rule, evidence obtained by searches and

---

[67] As discussed below, Detective Randazzo's conclusions were based in part on his training and experience, to which we give due deference. *See State v. Murray*, 213 A.3d 571, 579 (Del. 2019).

[68] *Jones v. State*, 745 A.2d 856, 860 (Del. 1999); *Garnett*, 308 A.3d at 641.

[69] *Diggs v. State*, 257 A.3d 993, 1003 (Del. 2021).

[70] In his Opening Brief, Register states that "[t]he Delaware Constitution provides even greater protections than the Federal Constitution." Opening Br. at 6. But Register provides no further argument on this point. Register did not raise an argument below that the Delaware Constitution departs from the United States Constitution, and that we must evaluate the issue under the Delaware Constitution as a result. *See* App. to Opening Br. at A7–11 (Register's Motion to Suppress). The argument is therefore waived, as Register made no argument on appeal that the interests of justice require us to evaluate it now. Del. Supr. Ct. R. 8. Even if it was not procedurally waived under Rule 8, "conclusory assertions that the Delaware Constitution has been violated will be considered to be waived on appeal. Accordingly, if an alleged violation of the Delaware Constitution is not fully and fairly presented to this Court, it will not be addressed on appeal." *Jackson v. State*, 990 A.2d 1281, 1288 (Del. 2009) (internal quotation marks and citation omitted).

16

seizures that violate these guarantees is inadmissible."[71]

An investigative detention constitutes a seizure and is permitted "only when there is 'some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity.'"[72] Stated differently, "law enforcement officers may stop or detain an individual for investigatory purposes, but only if the officer has reasonable articulable suspicion to believe the individual to be detained is committing, has committed, or is about to commit a crime."[73]

When evaluating whether a stop was supported by reasonable articulable suspicion, we "consider the totality of the circumstances known to the officer at the time of the stop."[74] Consistent with federal law, Delaware courts have adopted a two-pronged approach to evaluate whether the officer possessed reasonable articulable suspicion.[75] First, we assess the "objective observations and consideration of the modes or patterns of operations of certain kinds of

---

In line with *Jackson*, we do not address this constitutional issue. We address Register's claim under the United States Constitution.

[71] *Diggs*, 257 A.3d at 1003 (citing *Mapp v. Ohio*, 367 U.S. 643, 654 (1961)); *Jones*, 745 A.2d at 872 ("The exclusionary rule acts as a remedy for a violation of a defendant's right to be free of illegal searches and seizures. It provides for the exclusion from trial of any evidence recovered or derived from an illegal search and seizure.").

[72] *McDougal*, 314 A.3d at 1086 (quoting *Lopez-Vazquez*, 956 A.2d at 1287).

[73] *Woody v. State*, 765 A.2d 1257, 1262 (Del. 2001) (citing *Terry v. Ohio*, 392 U.S. 1, 30 (1968)); *see also* 11 *Del. C.* § 1902 (codifying this standard).

[74] *Lopez-Vazquez*, 956 A.2d at 1287.

[75] *See Quarles v. State*, 696 A.2d 1334, 1338 (Del. 1997) (citing *United States v. Cortez*, 449 U.S. 411, 417–18 (1981)).

lawbreakers."[76] Second, we "consider the inferences and deductions that a trained officer could make which might well elude and untrained person."[77] In more succinct terms, "[a] determination of reasonable suspicion must be evaluated in the context of the totality of the circumstances as viewed through the eyes of a reasonable, trained police officer in the same or similar circumstances, combining objective facts with such an officer's subjective interpretation of those facts."[78]

Reasonable articulable suspicion is "'considerably less' than proof by a preponderance of the evidence and less demanding than probable cause."[79] Accordingly, "[a] determination that reasonable suspicion exists . . . need not rule out the possibility of innocent conduct."[80]

### 2. The Seizure

We first must determine when Register was seized for Fourth Amendment purposes. The parties do not dispute that Register was seized when Probation Officer McHugh stopped Register and detained him for questioning after Register had walked away from the Wawa.[81]

---

[76] *Lopez-Vazquez*, 956 A.2d at 1287 (quoting *Riley v. State*, 892 A.2d 370, 375 (Del. 2006)).

[77] *Id.* (quoting *Riley*, 892 A.2d at 375).

[78] *Jones*, 745 A.2d at 861 (citing *Cortez*, 449 U.S. at 417–18); *Diggs*, 257 A.3d at 1004.

[79] *Diggs*, 257 A.3d at 1004 (quoting *Quarles*, 696 A.2d at 1337).

[80] *Murray*, 213 A.3d at 579 (quoting *United States v. Arvizu*, 534 U.S. 266, 277 (2002)).

[81] Opening Br. at 4, 8; Answering Br. at 5. This is also consistent with the Superior Court's order. *See Superior Court Order* at 2 ("[T]he police followed [Register] out of the parking lot of the Wawa. All were on foot. The body worn camera of a police officer tells the story of what

### 3. Reasonable Articulable Suspicion

Next, we reach the larger issue—whether police had reasonable articulable suspicion to stop Register, which led Register, upon request, to inform police that he had a firearm in his bag. We find that they did.

From a review of the record, the objective facts are adequate to meet the standard for reasonable articulable suspicion. Lopez had a history of dealing drugs in convenience store parking lots, though not this specific Wawa. Lopez was under active police surveillance on the day of Register's arrest. Lopez arrived at the Wawa as a passenger in the Hyundai, and Moore parked the car at the gas pumps. Lopez exited the Hyundai and stood at its rear, near the pump. A "short time later," Register walked up to Lopez and the two had a "very brief conversation."[82] Lopez proceeded to walk along the driver's side of the Hyundai. Moore exited the driver's seat so that Lopez could sit in it. Lopez spent several seconds reaching under the driver's seat. Lopez then exited the driver's seat and walked immediately to Register, who was still standing at the rear of the Hyundai. The two men touched hands. Immediately after, Lopez got into the Hyundai as a passenger and Moore drove away from the Wawa, while Register departed the Wawa on foot. The Wawa is in a high-crime area, and drug and firearm investigations and arrests had occurred previously there.

---

happened next. The officers approached [Register] and stopped him for questioning. For our purposes, we will call this a 'seizure' within the meaning of the Fourth Amendment.").

[82] App. to Opening Br. at A38–39 (Det. Randazzo Test.).

19

Detective Randazzo's subjective interpretation of the objective facts is also relevant. Although neither Detective Randazzo nor Detective Guarino saw what was exchanged, Detective Randazzo testified that, in light of his observations, Lopez and Register engaged in a hand-to-hand exchange consistent with a drug transaction.[83] Detective Randazzo also testified that he has specialized training and experience with hand-to-hand transactions, observing them on a weekly basis.[84] "Lawful and apparently innocent behavior may be 'meaningless to the untrained' but still raise reasonable suspicion of drug trafficking in the eyes of a reasonable, prudent, and experienced police officer."[85]

In this case, these facts, combined with Detective Randazzo's subjective interpretation of them, are sufficient to establish reasonable articulable suspicion under this Court's precedent.

---

[83] *Id.* at A41 (Det. Randazzo Test.) (testifying that when the two men reached out their hands, "there was some kind of exchange there"); *id.* at A64 (Det. Randazzo Test.) ("[I]t was several seconds reaching under the seat. Whatever [Lopez] obtained from that, he then immediately exited and walked however many feet back to the rear of the vehicle, and that's when I observed what I believed to be a hand-to-hand."); *id.* at A85–86 (Det. Guarino Test.) ("I saw Mr. Lopez exit the driver seat, walk back to the rear of his vehicle, have some sort of interaction with Mr. Register, get back in his vehicle, and then both parties left, from my viewpoint.").

[84] Detective Randazzo was in his third year as a Safe Streets officer, which deals with "mostly firearm and drug investigations." App. to Opening Br. at A28 (Det. Randazzo Test.). He testified that he received various narcotics trainings, and had observed "one to two" hand-to-hand transactions per week. *Id.* at A28–31 (Det. Randazzo Test.).

[85] *Harris v. State*, 806 A.2d 119, 121 (Del. 2002) (quoting *Cortez*, 449 U.S. at 419).

The facts and police observations in this case are similar to those in *Hudson v. State*,[86] where this Court concluded that police had reasonable articulable suspicion to stop the defendant. In *Hudson*, police were surveilling a known drug-dealing target who was driving a Nissan that entered a gas station outside Wilmington. A few minutes later, a Buick with Hudson in it parked in the same lot. A person exited the Buick, entered the Nissan, then exited the Nissan and reentered the Buick—all within a brief time period. No one purchased gas or entered the store. Both vehicles departed the lot. Police lost sight of the Nissan but followed the Buick to another gas station, where Hudson entered that store and exited it within about a minute. Once Hudson reentered the Buick, police seized him and the other occupants. After failing to comply with commands, police tased Hudson. Police found crack cocaine on his person and discovered drug paraphernalia in the car.

Hudson moved to suppress the seized evidence, which the Superior Court denied, holding that police had reasonable articulable suspicion to stop Hudson. In a decision affirming the trial court, this Court emphasized that police had the drug dealer under active investigation; the dealer would often meet people in his car outside Wilmington; a person from the Buick exited that car and entered the Nissan and then moments later exited the Nissan and reentered the Buick; and none of the

---

[86] 23 A.3d 865, 2011 WL 2651089 (Del. July 6, 2011) (TABLE). Notably, the Superior Court below relied on *Hudson* in denying Register's motion to suppress. *See Superior Court Order* at 4 n.4.

21

individuals purchased gas or entered the store.[87]  This Court also noted that the investigating officer had specialized training and experience with drug transactions, making her "highly knowledgeable of drug transactions and the conduct of drug dealers."[88]  Although the events of *Hudson* occurred in the middle of the afternoon in an area not known for drug dealing,

> the officers here observed the occupants of the Buick interacting with a known drug dealer in a manner consistent with a drug transaction.  The officers had reasonable articulable suspicion to seize the occupants of the Buick, given the totality of the circumstances "as viewed through the eyes of a reasonable, trained police officer in the same or similar circumstances, combining objective facts with such an officer's subjective interpretation of those facts."[89]

In the present case, the hand-to-hand transaction and Lopez's actions in the driver's seat between his two interactions with Register are analogous to the shuffling in and out of cars in *Hudson*.  The exchange here occurred in a type of place where the drug dealer, Lopez, was known to transact illicit business—convenience store parking lots.  It also occurred while Lopez was under surveillance.  And unlike *Hudson*, this all occurred in a high-crime area.

Based on his training and experience with hand-to-hand drug transactions, Detective Randazzo believed that he just witnessed one.  In other words, the

---

[87] *Hudson*, 2011 WL 2651089, at *5.

[88] *Id.*

[89] *Id.* (quoting *Hall v. State*, 981 A.2d 1106, 1111 (Del. 2009)).

22

detective "observed [Register] interacting with a known drug dealer in a manner consistent with a drug transaction."[90] So police "had reasonable articulable suspicion to seize [Register], given the totality of the circumstances 'as viewed through the eyes of a reasonable, trained police officer in the same or similar circumstances, combining objective facts with such an officer's subjective interpretation of those facts.'"[91]

Register contends that this Court's decision in *Lopez-Vazquez v. State* is instructive and stands for Register's proposition that police lacked sufficient "individualized" suspicion to stop him.[92] In *Lopez-Vazquez*, police were surveilling a suspect for drug activity when Lopez-Vazquez, the suspect, and another man (an

---

[90] *See id.*

[91] *See id.* (quoting *Hall*, 981 A.2d at 1111). In *Hudson*, this Court relied primarily on two decisions where this Court found reasonable articulable suspicion based on perceived drug transactions. In *Lofland v. State*, this Court considered a motion to suppress stemming from an investigatory stop where Lofland was observed leaning inside a van in a high-crime area. 834 A.2d 826, 2003 WL 22317402, at *1 (Del. Oct. 7, 2003) (TABLE). This Court held that "[g]iven [the officer]'s knowledge of the way drug deals were done in that neighborhood, his observation of Lofland's conduct was enough to create a reasonable and articulable suspicion that Lofland was engaged in the sale of illegal drugs." *Id.* And in *Hall v. State*, police observed Hall exit his car and enter the back seat of another car parked in a 7-Eleven parking lot. 981 A.2d at 1108, 1110. This Court found that the trial court properly concluded police had reasonable articulable suspicion based in part on the trial court's reasoning that "given [the officer]'s knowledge of the way drug transactions are done in the area, his observation of Hall's exiting his own vehicle and entering the back seat of the [other vehicle] was enough to create reasonable and articulable suspicion that Hall was engaged in the sale of illegal drugs." *Id.* at 1110, 1112–13. Notably, these three decisions found reasonable articulable suspicion on the conduct surrounding the perceived drug transactions. Whether police saw the items exchanged (like drugs or money) was not dispositive.

[92] Opening Br. at 5; Reply Br. at 1. Register's counsel also focused on this "individualized" suspicion proposition during oral argument.

23

"unrelated drug suspect") all entered an apartment building after Lopez-Vazquez and the unrelated suspect appeared to be "nervous[ly] and anxious[ly]" waiting for someone.[93] Police did not observe Lopez-Vazquez interact with the surveilled suspect, nor did they see him enter the suspect's apartment inside the building.[94] They did see Lopez-Vazquez exit the apartment building, alone, an hour later and stopped him.[95] Finding that the circumstances did not rise to reasonable articulable suspicion, this Court stated that nothing in the record provided "concrete reasons why the . . . innocent events that occurred before the seizure (for example, entering into a multi-unit apartment building after [the unrelated suspect], spotting Lopez–Vazquez outside of the building—and alone—an hour later by himself) combine into a 'suspicious conglomeration'" sufficient to support a stop.[96]

*Lopez-Vazquez* is distinguishable and does not support Register's proposition. There, no specific set of facts existed—like a hand-to-hand exchange immediately after a drug dealer enters and exits his car—that police could articulate to establish reasonable grounds to stop the defendant in that case.[97] Further, *Lopez-Vazquez* does

---

[93] 956 A.2d at 1290.

[94] *Id.*

[95] *Id.*

[96] *Id.* at 1291 (citations omitted).

[97] Nor is this case like *Harris v. State*, as Register and the dissent suggest. *See Harris*, 806 A.2d at 129 (finding that police lacked reasonable articulable suspicion to conclude defendant could be stopped as an alleged drug courier where defendant was observed looking over his shoulder on a train, meeting another man at the train station, using a payphone, popping his head up in the backseat of a car, and looking out the rear window of that car). The dissent's reliance on *Harris*

not stand for an "individualized" suspicion standard as Register suggests. In that case, this Court concluded in its reasonable articulable suspicion analysis: "We do not find the *totality of the circumstances* to give rise to the requisite reasonable and articulable suspicion of criminal activity by Lopez-Vazquez required under *Terry* to justify seizing him."[98]

Our colleagues in dissent rely on the distinguishable *Lopez-Vazquez* case to contend that we have found Register guilty by association with Lopez based on Lopez's "suspicious background."[99] Based on that framing of our analysis, the dissent "disagree[s] that mere association can carry such a burden."[100] We agree that mere association cannot establish reasonable articulable suspicion. But, here, there is more than mere association. We also have the facts and observations surrounding the hand-to-hand exchange.[101]

---

to state that the "present case raises similar concerns about overreliance on officer hunches" is off base.

[98] *Lopez-Vazquez*, 956 A.2d at 1291 (emphasis added); *see also Arvizu*, 534 U.S. at 274 (reversing the Ninth Circuit because its "evaluation and rejection of seven of the listed factors [of the case] in isolation from each other does not take into account the 'totality of the circumstances,' as our cases have understood that phrase").

[99] *See* Dissenting Op. at 31 ("In rejecting an analogy to *Lopez-Vazquez*, the Majority also appears to reject an individualized suspicion requirement. I cannot agree with such an associational approach to limiting individuals' Fourth Amendment rights."); *id.* at 40 ("The Majority emphasizes Lopez's suspicious background to argue that officers had reasonable articulable suspicion to detain Register.").

[100] *Id.* at 40–41.

[101] Our dissenting colleagues "do not dispute that association with a known criminal may combine with other sufficiently suspicious facts to support reasonable articulable suspicion." Dissenting Op. at 43. They, however, contend that "these suspicious facts are absent here and countervailing facts weigh against" our conclusion. *Id.* The dissent relies on two notable cases for its view that

Our colleagues in dissent also rely on this Court's decision in *Riley v. State*[102] to argue that Register engaged in nothing more than innocent behavior. In *Riley*, police stopped the defendant when they observed him enter a car of minors in a liquor store parking lot.[103] Police were monitoring the lot for underage liquor sales and believed that the defendant intended to purchase alcohol for or sell drugs to the minors.[104] Concluding that police lacked reasonable articulable suspicion, this Court stated, among other things, that there was "no evidence that the officers had observed a drug sale in that area before the defendant's stop,"[105] and that police did not observe the defendant exit the minors' car and proceed toward the liquor store to purchase alcohol for them.[106]

Here, however, Detective Randazzo testified that he and his team had "conducted several investigations stemming from that Wawa" involving firearms

---

we have found Register guilty by association with Lopez. First, the dissent points to *Lopez-Vazquez*, but as we have explained above, this case is unlike that one because police here pointed to specific facts—a hand-to-hand exchange immediately after Lopez entered and exited his car— that was absent in *Lopez-Vazquez*. Second, the dissent points to the Supreme Court's decision in *Sibron v. New York*, which held that "[t]he inference that persons who talk to narcotics addicts are engaged in the criminal traffic of narcotics is simply not the sort of reasonable inference required to support an intrusion by the police upon the individual's personal security." 392 U.S. 40, 62 (1968). *Sibron* is distinct from this case for the same reasons as *Lopez-Vazquez*—reasonable articulable suspicion here is based on more than mere association.

[102] 892 A.2d 370 (Del. 2006).

[103] *Id.* at 372–73.

[104] *Id.*

[105] *Id.* at 376.

[106] *Id.* at 378.

and drugs.[107]  And they observed Register and Lopez engage in a brief hand-to-hand exchange consistent with a drug transaction immediately after Lopez grabbed something from under the driver's seat of his car.  In other words, police in *Riley* did not observe a transaction,[108] but in this case they did.  Our dissenting colleagues suggest that *Riley* is an "innocent behavior" factual analogue to this case, but it is not.[109]

---

[107] App. to Opening Br. at A32 (Det. Randazzo Test.) ("I -- myself and my team, I've conducted several investigations stemming from that Wawa, and surrounding neighborhoods, whether it's firearm investigations or drug investigations in that area there.").

[108] *Riley*, 892 A.2d at 378 ("The record reflects that, not only did police officers not observe a transaction, but also that upon approaching the vehicle, the officers acknowledged that no crime involving the illegal purchase of alcohol could even have occurred.").

[109] Our dissenting colleagues look additionally to this Court's recent decision in *McDougal v. State*, 314 A.3d 1077 (Del. 2024), stating that they "cannot see how finding reasonable suspicion in this case is compatible with" *McDougal*.  Dissenting Op. at 31–32.  But comparison of *McDougal* and this case is strained.  The dissent states that "[u]nlike the *McDougal* officers, the officers who detained Register had received no informant tips, had found no guns, and had not observed Register blocking pedestrian traffic."  *Id.* at 32–33.  But the majority in *McDougal* discredited the tip and the gun.  It stated that the informant tip was "stale" and "unreliable," and that police found the gun "a month before" their encounter with the defendant.  *McDougal*, 314 A.3d at 1089, 1091.  And the final point, "blocking pedestrian traffic," was tied to officers' belief that the defendant was loitering, which this Court found to be incorrect.  *Id.* at 1091.  Fundamentally, the defendant in *McDougal* was stopped because police believed he was violating the loitering statute.  *Id.* at 1082 ("When asked at the suppression hearing to identify the criminal activity of which Officer Moses suspected McDougal when he directed McDougal to sit, the officer did not mention a suspicion of drug dealing or concealing a deadly weapon.  Instead, he responded that he suspected McDougal of loitering.").  It turned out that police did not have a "firm grasp of the conduct that constitutes loitering under the statute."  *Id.* at 1088.  In other words, the defendant was not loitering.  Because police stated that defendant's loitering was the illegal conduct observed to initially approach him, police lacked reasonable articulable suspicion to stop him.  *Id.* at 1080 ("[T]he State's attempt to justify the officers' seizure and eventual search of McDougal on the basis of a suspected loitering investigation is grounded in a flawed understanding of the loitering statute, the supposed violation of which by McDougal aroused the officers' suspicion.")  The facts of *McDougal* are materially different—this case has nothing to do with police failure to "firmly grasp" what conduct violates a loitering statute.

We cannot view the hand-to-hand transaction in a vacuum—we must also consider the circumstances surrounding that transaction. Under "the totality of the circumstances,"[110] police had reasonable articulable suspicion to believe Register committed a crime. They were therefore justified in stopping Register immediately after he departed the Wawa, and detaining him long enough to dispel their suspicion. After being asked if he had a firearm, to which Register responded affirmatively, police had sufficient grounds to arrest Register and seize the firearm, which had an obliterated serial number and was therefore illegal.

## IV. CONCLUSION

For the foregoing reasons, the judgment of the Superior Court is AFFIRMED.

---

[110] *Jones*, 745 A.2d at 861 (citing *Cortez*, 449 U.S. at 417–18).

**VALIHURA**, J., dissenting; joined by **TRAYNOR**, J.:

*I. SUMMARY OF MY CONCLUSIONS*

In September 2022, officers on proactive patrol noticed a man engage in a hand-to-hand interaction with a drug investigation target at a Wawa gas pump. The interaction occurred in broad daylight. The officers neither observed an object change hands nor observed either individual store away any object following the interaction.

After observing this mid-day interaction, officers detained the drug investigation target – Khaalid Lopez – and the man – Defendant-Appellant Elijah Register. Officers found no drugs on either individual but arrested Register after finding a firearm.

Register argues on appeal that the trial court improperly denied his motion to suppress the firearm because his detention violated the Fourth Amendment to the United States Constitution and Article 1, Section 6 of the Delaware Constitution.

The Majority holds that officers had reasonable articulable suspicion to detain Register, but I respectfully disagree. Although this is a close case, I would hold that the totality of the circumstances shows the specific articulated facts fell short of reasonable articulable suspicion. Stops correctly based on reasonable articulable suspicion are important tools of law enforcement but setting the standard too low has costs that our constitutional system cannot tolerate. Here, I believe that Register's behavior of engaging in what officers admit could have been a handshake in broad daylight does not rise to the narrow exception allowed for a *Terry* stop.

My conclusion is bolstered by case law from this Court and from this Court's sister

jurisdictions. The facts of this case are thinner than those where this Court has found reasonable articulable suspicion in the past. Likewise, other state and federal courts have declined to find reasonable suspicion on similar facts.

Despite frequently arising, reasonable articulable suspicion cases are often difficult to answer and require fact-intensive inquiries. Here, I respectfully disagree with the Majority as I believe that Register's detention was unconstitutional, that its fruits should have been suppressed and that this case should be reversed.

## II. RELEVANT FACTUAL AND PROCEDURAL BACKGROUND[1]

### A. Officers Observe Register While on Proactive Patrol

On the afternoon of September 21, 2022, Safe Streets police and parole officers proactively patrolled the Targeted Analytical Policing System ("TAPS") high crime area near the Route 9 and Route 13 corridor.[2] Detective Anthony Randazzo was in an undercover vehicle in the area of Memorial Drive and Route 13.[3] Detective Randazzo testified that as a Safe Streets officer, he had previously viewed drug transactions "anywhere, really, but, you know, gas stations, convenience stores, sides of the road. It

---

[1] The Superior Court opinion contains few factual findings. The following facts are primarily from the testimony of Detective Anthony Randazzo and Detective Kenneth Guarino at the Motion to Suppress hearing on July 21, 2023. App. to Opening Br. at A23–124 (Motion to Suppress Hearing Trans.).

[2] *State v. Register*, 2023 WL 6323594, at *1 (Del. Super. Ct. Sept. 26, 2023); App. to Opening Br. at A32, A35 (Detective Anthony Randazzo Motion to Suppress Testimony [hereinafter "Randazzo Test."] at 10:14–16, 13:8–17); *id.* at A80 (Randazzo Test. at 58:1–7) ("THE COURT: Lopez-- no, first, what time of the day or night was all this? THE WITNESS: I believe it was in the afternoon. THE COURT: So it was daytime? THE WITNESS: Yes, sir."); *id.* at A33 (Randazzo Test. at 11:1–3).

[3] App. to Opening Br. at A37 (Randazzo Test. at 15:1–3).

2

can be from car to car; it can be person to person. It varies."[4]

Another detective, Detective Donald Witte, notified Detective Randazzo and his team that he observed Khaalid Lopez in a white Hyundai sedan with a female operator who was later identified as Nevaeh Moore.[5] The Safe Streets officers knew Lopez because he was a suspect in a previous drug investigation in the area of Route 40 and Pulaski Highway.[6] Lopez was known to "meet at different convenience stores at different areas[,]" and to "direct[] individuals to different areas to conduct the illicit drug sales."[7] The vehicle in which Lopez was a passenger stopped at a gas pump at the Wawa located at 4000 North Dupont Highway.[8] The police did not specifically know Lopez to sell drugs at this particular Wawa.[9] Detective Randazzo testified that he conducted prior investigations and made arrests at that Wawa previously;[10] however, he was not conducting surveillance specifically at that Wawa that day.[11]

Detective Randazzo's view was partially obscured by the position of the car Lopez

---

[4] *Id*. at A31 (Randazzo Test. at 9:15–19).

[5] *Id*. at A37, A38 (Randazzo Test. at 15:5–10, 16:18–20).

[6] *Id*. at A36 (Randazzo Test. at 14:1–4); *Register*, 2023 WL 6323594, at *1 ("The suspect was a drug dealer known to the police and known to deal drugs in parking lots of convenience stores, albeit not this particular parking lot of this particular convenience store.").

[7] App. to Opening Br. at A80 (Randazzo Test. at 58:18–23). According to Detective Randazzo, Lopez was seen attempting to solicit narcotic sales through social media and was seen in possession of a firearm while a person prohibited. *Id*. at A36 (Randazzo Test. at 14:5–11).

[8] *Id*. at A37 (Randazzo Test. at 15:14–20); *id.* at A31 (Randazzo Test. at 9:20–23).

[9] *Id*. at A80 (Randazzo Test. at 58:15–19). Detective Randazzo has no personal knowledge of whether there was phone records or text messages indicating that Lopez directed Register to meet him at that Wawa for a drug transaction. *Id*. at A82–83 (Randazzo Test. at 60:17–61:2).

[10] *Id.* at A32 (Randazzo Test. at 10:8–10).

[11] *Id*. at A50–51 (Randazzo Test. at 28:18–20, 29:13–15).

exited. Detective Randazzo stopped at a pump and was seated in the driver's seat of his vehicle where he could observe Lopez through his passenger window and part of his windshield.[12] The gas pump was to Detective Randazzo's left.[13] The pump where the Hyundai sedan was parked was also to its left. As a result, the fronts of the cars faced each other.[14] The Hyundai sedan was between Detective Randazzo and Lopez, in the space between the pumps where cars would normally pass through and the passenger side of Detective Randazzo's car.[15] This was a well-lit area, and it was broad daylight.[16] Detective Randazzo did not capture video of this interaction on his body camera, nor did he collect surveillance footage from the Wawa.[17]

When Detective Randazzo initially saw Lopez, Lopez was standing by the rear of

---

[12] *Id.* at A55 (Randazzo Test. at 33:3–5) ("Q: And you were in the driver seat of your vehicle? A: Yes."); *id.* at A55–56 (Randazzo Test. at 33:22–34:8) ("Q: And his vehicle -- so when you're looking at him, is his vehicle in front of you to the right? A: Yeah, it's up -- it's up at an angle -- up to the right and on an angle. Q: Okay. So you're looking at him through your windshield; correct? A: Windshield and -- passenger side window.").

[13] *Id.* at A55 (Randazzo Test. at 33:7–10) ("I was parked -- the pump was to my left and there was nothing in between my view of him except for his car, so I was able to see[.]"); *id.* (Randazzo Test. at 33:16) ("The pumps were to my left how I was parked.").

[14] *Id.* at A38 (Randazzo Test. at 16:7–9) ("I was parked at one of the pumps. So Mr. Lopez was facing -- the vehicle was facing me to my right."); *id.* at A54–55 (Randazzo Test. at 32:22–33:2) ("Q: And at that -- at that – while you were sitting in the vehicle, you were facing the vehicle of Mr. Lopez? A: I – yes, sir."); *id.* at A55 (Randazzo Test. at 33:14–15) ("So he was parked -- if he's facing me, which he was, the pump was to his left.").

[15] *Id.* at A55 (Randazzo Test. at 33:7–10) ("I was parked -- the pump was to my left and there was nothing in between my view of him except for his car, so I was able to see[.]").

[16] *Id.* at A80 (Randazzo Test. at 58:6–10).

[17] *Id.* at A56–57 (Randazzo Test. at 34:16–35:1) ("Q: There is Wawa surveillance at that location, is there not? A: I believe there is, yes. Q: Have you ever viewed that Wawa surveillance? A: I have not viewed it. Q: Have you ever collected that Wawa surveillance? A: I did not collect any surveillance."); *id.* at A57 (Randazzo Test. at 35:8–15).

the Hyundai sedan.  Detective Randazzo was not "able to see if there was a pump in the car at that time," but he speculated that Lopez "may have been pumping gas."[18]  Up until that point, Detective Randazzo stated that he did not see any criminal activity.[19]  An unknown individual, later identified as Defendant-Appellant Register, approached Lopez at the rear of the vehicle.[20]  Register and Lopez had a brief conversation[21] but Detective Randazzo could not hear what was said.[22]  The vehicle was blocking "portions" of Detective Randazzo's view where the two were standing.[23]

Next, Lopez walked along the driver's side of the vehicle, between the pump and the car, to the driver's seat of the car.[24]  Moore exited the driver's seat, and Lopez entered. Lopez sat in the driver's seat with the door open.[25]  Detective Randazzo stated that he could

---

[18] *Id*. at A38 (Randazzo Test. at 16:11–16); *Register*, 2023 WL 6323594, at *1 ("In any event, the suspect under surveillance was in a Wawa store parking lot, apparently getting gas.").

[19] App. to Opening Br. at A53 (Randazzo Test. at 31:7–12) ("Q:  So at that point, besides the fact that he pulled up there and the fact that you -- the officers all know him as Mr. Lopez, you didn't see any criminal activity at that point?  A:  I did not, no.").

[20] *Id*. at A38–39 (Randazzo Test. at 16:20–17:1) ("And a short time later, I observed a black male who was wearing a white tank-top style shirt and a black fanny pack approaching Mr. Lopez at the rear of the vehicle."); *id*. at A60 (Randazzo Test. at 38:22–39:2) (the initial conversation occurred "to the rear of the vehicle, right where Mr. Lopez was when I originally saw him.").

[21] *Id*. at A39 (Randazzo Test. at 17:16–18).

[22] *Id*. at A61 (Randazzo Test. at 39:19–21).

[23] *Id*. (Randazzo Test. at 39:11–14) ("Q:  So when they're standing behind the vehicle, is the vehicle itself blocking your view?"  A:  Portions of it, yes.").

[24] *Id*. at A39 (Randazzo Test. at 17:18–22) ("Mr. Lopez then went to the driver side of the car, the female exited the car, Mr. Lopez sat in the driver seat and then he began to reach underneath of the seat for several seconds."); *id*. at A62 (Randazzo Test. at 40:16–23) ("He walked directly from the driver side rear directly to the driver side, to the door).

[25] *Id*. at A63–64 (Randazzo Test. at 41:23–42:2) ("I believe it was open, and he -- he -- that's when he started reaching under the seat.").

5

"see him lean over and begin moving his arms[.]"[26]  Detective Randazzo testified that Lopez was reaching under the seat, "for several seconds" and retrieving something.[27] Detective Randazzo could not "see what was obtained" or see Lopez's hands to know if something was actually retrieved.[28]  Then, Lopez exited the driver seat door and walked back along the vehicle to where Register remained by the rear.[29]

According to Detective Randazzo, Lopez handed an unknown object to Register in what he described as a "hand to hand," transaction or "exchange."[30]  Detective Randazzo testified that he was familiar with hand-to-hand transactions because he had seen them numerous times — about one to two a week.[31]  When asked for further details, Detective Randazzo said he saw Lopez "put his hand out.  The defendant placed his hand out"[32] but

---

[26] *Id*. at A63 (Randazzo Test. at 41:7–9) ("I could see him lean over and begin moving his arms and reaching under the seat.").

[27] *Id*. (Randazzo Test. at 41:7–9) ("I could see him lean over and begin moving his arms and reaching under the seat."); *id*. at A41 (Randazzo Test. at 19:1–2) ("He then reached under the seat for several seconds[.]").

[28] *Id*. at A41 (Randazzo Test. at 19:21–23) ("Q:  And you testified you couldn't see what that was? A: I could not see what that was."); *id*. at A65 (Randazzo Test. at 43:7–11, 43:21–23) ("Q:  Could you see what he was reaching for?  A:  I had already said I wasn't able to see what was obtained, but he's reaching under his seat.  … Q:  So you could not see his hands; correct? A:  No."); *id*. at A66 (Randazzo Test. at 44:1–3) ("Q:  And you did not actually see what he took out of that driver seat? A:  Correct.").

[29] *Id*. at A39 (Randazzo Test. at 17:22–23) ("He then got out of the car and handed an unknown item to the male."); *id*. at A40 (Randazzo Test. at 18:21–23) ("[T]he defendant was -- stayed at the rear of the vehicle while Mr. Lopez got back into the driver seat[.]").

[30] *Id*. at A64 (Randazzo Test. at 42:4–8) ("Whatever he obtained from that, he then immediately exited and walked however many feet back to the rear of the vehicle, and that's when I observed what I believed to be a hand-to-hand."); *Register*, 2023 WL 6323594, at *1 ("While so engaged, the Defendant appeared at the pumps and engaged in a 'hand to hand' transaction of some type. Police suspected it was drugs.").

[31] App. to Opening Br. at A30, A31 (Randazzo Test. at 8:10–16, 9:3–11).

[32] *Id*. at A41 (Randazzo Test. at 19:2–5) ("[Lopez] got out and walked directly to the defendant

he could not "actually see what was exchanged."[33]

When Trial Counsel asked Detective Randazzo if Lopez could have been "shaking his hand or something[,]" Detective Randazzo stated, "[i]t could have been -- it's consistent with a hand-to-hand transaction, sir."[34]  Trial Counsel also asked "could he have just reached his hand out and touched his hand?"[35]  Detective Randazzo acknowledged "[h]e could have," but he insisted "[a]gain based on the totality of what happened in that instance, it was indicative of a hand to hand."[36]  He also stated that it was "a very brief interaction, and then they immediately parted ways."[37]  Lopez entered the car through the driver's seat and "scooted over" to the passenger seat."[38]  Lopez departed from the Wawa in the vehicle with Moore driving.[39]

The officers decided to stop Lopez and Register.  Detective Kenneth Guarino, another member of the Safe Streets unit, was one of the officers tasked with stopping Register.[40]  Before initiating the stop, Detective Guarino saw Lopez "exit the driver seat,

---

and put his hand out.  The defendant placed his hand out, and there was some kind of exchange there.").

[33] *Id*. at A67 (Randazzo Test. at 45:1–6) (A:  I wasn't able to see what was exchanged there, but it was an exchange.  Q:  You couldn't actually see the exchange; correct?  A:  No, I couldn't actually see what was exchanged.").

[34] *Id*. (Randazzo Test. at 45:8–12).

[35] *Id*. (Randazzo Test. at 45:18–19).

[36] *Id*. at A67–68 (Randazzo Test. at 45:20–46:1).

[37] *Id*. at A67 (Randazzo Test. at 45:15–16).

[38] *Id*. at A42 (Randazzo Test. at 20:8–11).

[39] *Id*. (Randazzo Test. at 20:10–13).

[40] *Id*. at A85 (Detective Kenneth Guarino Testimony [hereinafter "Guarino Test."] at 63:14–16).

7

walk back to the rear of his vehicle, have some sort of interaction with Mr. Register, get back in his vehicle, and then both parties left[.]"[41]  Detective Guarino could not see any objects exchanged between Lopez and Register.[42]  Detective Guarino stated that he never observed Register place anything in his bag or pockets during his observation.[43]  Detective Guarino followed Register in his undercover vehicle as Register walked towards Route 13.[44]

Officer McHugh, a Safe Streets Probation Officer, approached Register on foot and immediately restrained him.[45]  The Superior Court found that to be the moment when the

---

[41] *Id*. at A85–86 (Guarino Test. at 63:22–64:3).

[42] *Id*. at A91 (Guarino Test. at 69:13–16) ("Q:  And you couldn't see what -- any objects that were handed between Mr. Lopez and Mr. Register?  A:  No.").  On cross-examination at trial, Detective Guarino testified to the following:

> Q:  And you said when you arrived you could see Mr. Register making contact with Mr. Lopez?
>
> A:  Correct, yes.
>
> Q:  But you could not see what was exchanged, is that correct?
>
> A:  No I could not.
>
> Q:  You couldn't tell if it was guns or money or drugs?
>
> A:  No I could not.

October 10, 2023 Bench Trial Transcript [hereinafter "Bench Trial Trans."] at 40:10–21.

[43] App. to Opening Br. at A91–92 (Guarino Test. at 69:21–70:10) (acknowledging "there was cars and stuff that were blocking [his] view" but responding that he did not "ever observe Mr. Register place anything in his bag" and he did not "ever see [Register] place anything in his pockets[.]"); *Register*, 2023 WL 6323594, at *1 ("To confirm or dispel their suspicions, the police followed the Defendant out of the parking lot of the Wawa.  All were on foot.").

[44] App. to Opening Br. at A86 (Guarino Test. at 64:16–18).

[45] The parties differently interpret at what point Register was handcuffed.  *See id*. at A94–95 (Guarino Test. at 72:16–73:10); *id*. at A102–03 (Motion to Suppress Hearing Trans. at 80:5–81:18); *Register*, 2023 WL 6323594, at *1.

interaction became a seizure.[46]

The body camera footage shows that when Detective Guarino approached Officer McHugh and Register, Officer McHugh had already detained Register and had Register's arms behind his back.[47] As Officer McHugh reached his right arm toward Register's waist, he asked, "[inaudible] any types of weapons or anything on you?" to which Register responded, "yes."[48] There was the jangling of handcuffs as the officers confirm that Register said "yes."[49] Although it was out of view, the leaning position of Officer McHugh's body and a metallic clicking suggest that Register was handcuffed at this point.[50] As Officer McHugh handcuffed Register, the officers asked "[i]s it in your bag, sir? Is it in your bag?"[51] As Detective Guarino removed Register's crossbody bag, Register responded, "yes."[52]

An officer asked, "do you have anything in your waistband or pockets?" and Register responded, "nope."[53] Detective Guarino asked "what's your name?" as he tugged

---

[46] *Register*, 2023 WL 6323594, at *1 ("The officers approached the Defendant and stopped him for questioning. For our purposes, we will call this a 'seizure' within the meaning of the Fourth Amendment. They asked him his name and, as the Defendant put his backpack on the ground, they asked if he had anything in his backpack.").

[47] Detective Guarino Body Worn Camera Video [hereinafter "Guarino BWC"] at 00:20–00:35.

[48] *Id*. at 00:35–38.

[49] *Id*. at 00:38–41.

[50] *Id*. at 00:39–43.

[51] *Id*. at 00:41–46.

[52] *Id*. at 00:45–48.

[53] *Id*. at 00:55–59.

on Register's waistband and searched his pockets.[54]  Register responded, "Elijah" and then

"Register."  Detective Guarino searched Register's back pocket and retrieved three light

blue, round pieces of candy and said "[s]ome Skittles?"[55]  Register stated "that's candy.

You can eat it."[56]  Detective Guarino threw a small rectangular object on the ground that

looks like a card holder or wallet and searched Register's bag.[57]  There was an

unidentifiable small bottle of something, some jerky, and a portion of the firearm visible.[58]

When Trial Counsel asked whether the officers found "evidence of a drug transaction[,]"

Detective Guarino responded "[n]ot that I can recall, no."[59]

When Detective Randazzo stopped Lopez in the subsequent traffic stop,[60] Lopez

---

[54] *Id*. at 01:00–10.

[55] *Id*. at 01:10–15.  App. to Opening Br. at A92 (Guarino Test. at 70:11–17) ("Q:  And when you made contact with Mr. Register, either you or another officer searched Mr. Register's pockets?  A:  Correct, sir; yes.  Q:  And you didn't find anything in the pockets, correct?  Except some Skittles.  A:  Just Skittles.").

[56] Guarino BWC at 01:14–17.

[57] *Id*. at 01:23–35; App. to Opening Br. at A92 (Guarino Test. at 70:18–20) ("Q:  And then -- so the bag as well, there was a gun found in the bag; correct?  A:  Yes, sir.").

[58] Guarino BWC at 01:27–35.

[59] App. to Opening Br. at A96 (Guarino Test. at 74:3–5).  On cross-examination at trial, Detective Guarino more definitively testified the following:

> Q:  Did you find any drugs?
> A:  Not that I recall, no.
> Q:  So nothing consistent with a hand-to-hand transaction, then, that you witnessed?
> A:  Not that I found, no.

Bench Trial Trans. at 41:7–11.

[60] Regarding what was found at the stops, the trial court found it was too little too late:

> Defendant's motion is not well taken.  Defendant argues that the alleged drug dealer (the one getting gas in his car) denied selling the Defendant any drugs.  Whatever relevance that statement has to the truth, it came too late to be part of this analysis: by the time the drug dealer was stopped in his car and told the police he had not

10

stated "that it was a vape that [Lopez] passed to [Register] that Mr. Register smoked."[61]

Detective Randazzo never saw Register smoke a vape.[62] When officers searched Lopez's

car, they located no drugs.[63] Detective Randazzo did not recall if there was a vape or excess

amounts of money in the vehicle.[64]

Although Detective Randazzo did not search Register, he stated that "there was a

firearm located in the fanny pack" and that "[i]t could be possible" that Lopez gave Register

the firearm.[65] However, Detective Randazzo stated that he "couldn't see if anything was

placed" in the fanny pack when Register walked to the front of the Wawa after the

interaction.[66]

---

sold drugs to the Defendant, other officers had already stopped the Defendant and
he had already told them there was a gun in his backpack.

*Register*, 2023 WL 6323594, at *1.

[61] App. to Opening Br. at A68–69 (Randazzo Test. at 46:17–47:4).

[62] *Id*. at A69 (Randazzo Test. at 47:5–20).

[63] *Id*. at A70 (Randazzo Test. at 48:11–12).

[64] *Id*. (Randazzo Test. at 48:6–9, 48:13–16). At trial, Detective Randazzo more definitively testified that "[t]here wasn't a substantial amount of money, I don't believe anything that was seizable." Bench Trial Trans. at 28:2–3.

[65] App. to Opening Br. at A72 (Randazzo Test. at 50:14–19) ("A: I know there was a firearm located in the fanny pack that Mr. Register -- Q: So was -- is it possible that a firearm was handed from Mr. Lopez to Mr. Register? A: It could be possible."); *id*. at A72–73 (Randazzo Test. at 50:20–51:2) ("Q: Really? So you see a hand-to-hand transaction -- A: Um-hmm. Q: -- you can't tell what it is, but it could be a firearm? A: It -- yes, could be.").

[66] *Id*. at A74 (Randazzo Test. at 52:1–20) ("Q: Did you see Mr. Register, at any time, place anything in that fanny pack after this hand-to-hand transaction with Mr. Lopez? A: So he immediately turned and began walking to the -- I guess it would be the front of the Wawa there, and the vehicle drove away. So, again, once that was -- once I observed that interaction, he turned, I couldn't see if anything was placed in there at that point."); *id*. at A74–75 (Randazzo Test. at 52:21–53:2) ("Q: Okay. So you didn't see him place anything in that fanny pack; correct? A: I don't know if it was placed in there, no.").

*B. The Trial Court Denies Register's Motion to Suppress the Seized Firearm*

Trial Counsel filed a Motion to Suppress the seized firearm.[67] Trial Counsel argued that officers lacked reasonable articulable suspicion when they detained Register and, consequently, "[t]he fruits of the search of [Register] and [Register]'s bag must be suppressed."[68] The State responded that officers had reasonable articulable suspicion, and that the firearm should not be suppressed.[69]

The trial court held a suppression hearing and, following testimony that established the facts described above, the trial court heard oral arguments from Trial Counsel and the State. The State discussed the allegedly suspicious nature of the Wawa interaction as follows:

> **MR. BETTS [State]:** This was a very brief and suspicious transaction between two people.
>
> **THE COURT:** What was suspicious about it?
>
> **MR. BETTS:** That the passenger of this vehicle, who was around where the defendant lives, goes to a high-crime Wawa.
>
> **THE COURT:** It's not a high-crime Wawa, yo; it's a Wawa.
>
> **MR. BETTS:** It's a TAPS Wawa.
>
> **THE COURT:** It's not a TAPS Wawa. Mr. Wawa would be very upset with you right now.
>
> **MR. BETTS:** The driver gets out of the vehicle, the passenger gets in the driver seat, reaches under the seat, proceeds to the back of the vehicle, and

---

[67] *Id.* at A6–12 (Motion to Suppress). The Motion also sought to suppress Register's statements allegedly taken in violation of *Miranda*. *Id.* at A10–11. That issue is not before us on appeal.

[68] *Id.* at A10 (Motion to Suppress).

[69] *Id.* at A13–22 (State's Response to Defendant's Motion to Suppress).

12

he - - what they observe is what they believe is a hand-to-hand transaction.[70]

Trial Counsel disputed the suspicious nature of the interaction and emphasized the lack of information officers had regarding the allegedly transacted goods.

> **THE COURT:** Well, your point of that is that the officer was unfamiliar enough with whatever it was that was transferred from Lopez to the defendant, he was unable to be clear about the size, shape and so forth, even to the point that it could have been a gun. But you don't think it was a gun. The government doesn't think it's a gun. You're just making the point that he didn't see it.
>
> **MR. MOTOYOSHI [Trial Counsel]:** Exactly. So he has no idea of what was - - the fact that it could be as large as a gun or as small as some drugs - -
>
> **THE COURT:** Right.
>
> **MR. MOTOYOSHI:** - - or money - -
>
> **THE COURT:** Right.
>
> **MR. MOTOYOSHI:** - - none of that was found either with Mr. Register - -[71]

A few months later, the trial court denied the Motion to Suppress.[72] The court noted that "Defendant's only route through his predicament would be if police did not have a 'reasonable articulable suspicion' to believe that the Defendant had just purchased drugs from the dealer with whom he had just interacted in the gas station."[73] The court then denied to motion writing the following:

---

[70] *Id.* at A107–08 (Motion to Suppress Hearing Trans. at 85:22–86:19).

[71] *Id.* at A115 (Motion to Suppress Hearing Trans. at 93:1–93:20).

[72] *State v. Register*, 2023 WL 6323594 (Del. Super. Ct. Sept. 26, 2023) (Order Denying Defendant's Motion to Suppress).

[73] *Id.* at *2.

It is surely true that not every apparent hand to hand transaction warrants police stopping the parties to inquire further about what just happened. There may indeed be such transactions that raise no suspicions whatsoever. Here, however, the drug dealing suspect was known to sell drugs in the parking lot of convenience stores, he was under active surveillance, and Defendant's conduct was consistent with a drug transaction. Proof beyond a reasonable doubt? Probably not. But certainly within the bounds of a reasonable articulable suspicion to at least stop the Defendant briefly and detain him long enough to allay law enforcement's concerns that the had not just committed a criminal act. Because the Defendant told them he had a firearm in his backpack, he gave them all the additional information they needed to seize the gun and charge him with an offence. The Defendant's admission saves us the trickier question whether police could search Defendant's backpack without further information.[74]

## C. Contentions on Appeal

Register seeks reversal of his conviction arguing that the officers did not have reasonable articulable suspicion when they detained him. The State argues that the officers had reasonable articulable suspicion based on the "hand to hand transaction" which the officers suspected was a contraband drug transfer.

For the reasons below, I believe that Register has the better argument and I would reverse and remand for a new trial.

## III. STANDARD OF REVIEW

"'We review the grant or denial of a motion to suppress for an abuse of discretion.'"[75] However, "'[e]mbedded legal conclusions are reviewed *de novo* for errors

---

[74] *Id.* The court also held that "Defendant's motion to exclude his post *Miranda* statements [was] moot[]" because "[t]he State has responded that it does not intend to use any such statements[.]" *Id.* This issue is not before us on appeal.

[75] *State v. Murray*, 213 A.3d 571, 577 (Del. 2019) (quoting *Lopez-Vazquez v. State*, 956 A.2d 1280, 1285 (Del. 2008)).

14

in formulating or applying legal precepts.'"[76]  "Accordingly, we review *de novo* whether the police possessed reasonable, articulable suspicion to stop a person."[77]

## IV.  ANALYSIS

As the Superior Court observed: "Defendant's only route through his predicament would be if the police did not have a 'reasonable articulable suspicion' to believe that the Defendant had just purchased drugs from the dealer with whom he had just interacted in the gas station."[78]  I would hold that Register has successfully navigated this route and, accordingly, I respectfully dissent.

### A.  Constitutional Protections Against Searches and Seizures

Individuals in Delaware are protected from unreasonable searches and seizures by both the Fourth Amendment to the United States Constitution and Article I, Section 6 of the Delaware Constitution.[79]  "Under the Fourth Amendment, '[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated[.]'"[80]  The Delaware Constitution compliments this federal protection as "Article I, Section 6 provides that '[t]he people shall be secure in their persons, houses, papers and possessions, from unreasonable searches and seizures[.]'"[81]

---

[76] *Id.* (quoting *Flowers v. State*, 195 A.3d 18, 23 (Del. 2018)) (internal quotation omitted).

[77] *Id.* (citing *State v. Rollins*, 922 A.2d 379, 382 (Del. 2007)).

[78] *Register*, 2023 WL 6323594, at *1.

[79] *Womack v. State*, 296 A.3d 882, 889 (Del. 2023).

[80] *Id.* (quoting U.S. Const. amend. IV).

[81] *Id.* (quoting Del. Const. art. I, §6).  Register argues on appeal that "[t]he Delaware Constitution provides even greater protections than the Federal Constitution."  Opening Br. at 6 (citing *Dorsey v. State*, 761 A.2d 807 (Del. 2000)).  However, Register did not ask below, nor does he now on appeal ask for greater protections, nor does he provide legal argument, analysis, or authority as to

In *Flowers v. State*, this Court identified an exception to the United States and Delaware Constitutions' general protections against unreasonable searches and seizures:

> Police may "restrain an individual for a short period of time" to investigate where officers have "reasonable articulable suspicion that the suspect has committed or is about to commit a crime." It requires less than probable cause. This form of seizure is the *Terry* "stop," or investigative stop. For simplicity, we refer to such a seizure as a "stop" in this opinion.[82]

This Court held that "[t]he State of Delaware has adopted [the holding in *Terry v. Ohio*], and Section 1902 of Title 11 governs such 'investigative' or *Terry* stops in this State."[83] Under 11 *Del. C.* § 1902:

> (a) A peace officer may stop any person abroad, or in a public place, who the officer has *reasonable ground to suspect is committing, has committed or is about to commit a crime,* and may demand the person's name, address, business abroad and destination.
>
> (b) Any person so questioned who fails to give identification or explain the person's actions to the satisfaction of the officer may be detained and further questioned and investigated.
>
> (c) The total period of detention provided for by this section shall not exceed 2 hours. The detention is not an arrest and shall not be recorded as an arrest in any official record. At the end of the detention the person so detained shall be released or be arrested and charged with a crime.[84]

---

why the Delaware Constitution provides greater protections in this case. Because "'[s]ummary arguments unsupported by legal argument, analysis, and authority are waived[,]'" *Thomas v. State*, 293 A.3d 139, 141 (Del. 2023), I decline to address Register's appeal under Article I, Section 6 of the Delaware Constitution. *See also Lloyd v. State*, 292 A.3d 100, 110 n.48 (Del. 2023) (citing *Ortiz v. State*, 869 A.2d 285, 291 n.4 (Del. 2005), *overruled on other grounds by Rauf v. State*, 145 A.3d 430 (Del. 2016)) (discussing when it is appropriate for this Court to analyze when the Delaware Constitution provides broader protections).

[82] *Flowers*, 195 A.3d 18, 24–25 (Del. 2018) (citations omitted). *See generally Terry v. Ohio*, 392 U.S. 1 (1968).

[83] *Flowers*, 195 A.3d at 24.

[84] 11 *Del. C.* § 1902 (emphasis added).

16

A "reasonable ground" is a "reasonable and articulable suspicion."[85] "'A determination of reasonable suspicion must be evaluated in the context of the totality of the circumstances as viewed through the eyes of a reasonable, trained police officer in the same or similar circumstances, combining objective facts with such an officer's subjective interpretation of those facts.'"[86] It requires more than an inarticulate hunch and good faith by the officer.[87]

Seemingly lawful behavior can give rise to a reasonable suspicion of criminal activity under certain circumstances. The United States Supreme Court has observed that:

> There is nothing unusual in two men standing together on a street corner, perhaps waiting for someone. Nor is there anything suspicious about people in such circumstances strolling up and down the street, singly or in pairs. Store windows, moreover, are made to be looked in. But the story is quite different where, as here, two men hover about a street corner for an extended

---

[85] *Jones v. State*, 745 A.2d 856, 861 (Del. 1999) ("Delaware has codified this standard for investigatory stops and detentions in 11 *Del. C.* § 1902. For the purpose of this analysis, 'reasonable ground' as used in Section 1902(a) has the same meaning as reasonable and articulable suspicion.").

[86] *Diggs v. State*, 257 A.3d 993, 1004 (Del. 2021) (quoting *Jones*, 745 A.2d at 861) ("This level of justification is often referred to as reasonable articulable suspicion and is considerably less than proof by a preponderance of the evidence and less demanding than probable cause, which is necessary to support an arrest." (internal quotation marks and citations omitted)). The United States Supreme Court held the same in *United States v. Sokolow*:

> The Fourth Amendment requires "some minimal level of objective justification" for making the stop. That level of suspicion is considerably less than proof of wrongdoing by a preponderance of the evidence. We have held that probable cause means "a fair probability that contraband or evidence of a crime will be found," and the level of suspicion required for a *Terry* stop is obviously less demanding than that for probable cause[.]

490 U.S. 1, 7 (1989) (citations and quotations omitted).

[87] *Terry*, 392 U.S. at 22 ("Anything less would invite intrusions upon constitutionally guaranteed rights based on nothing more substantial than inarticulate hunches, a result this Court has consistently refused to sanction. And simple 'good faith on the part of the arresting officer is not enough.'" (citations and quotations omitted)).

17

period of time, at the end of which it becomes apparent that they are not waiting for anyone or anything; where these men pace alternately along an identical route, pausing to stare in the same store window roughly 24 times; where each completion of this route is followed immediately by a conference between the two men on the corner; where they are joined in one of these conferences by a third man who leaves swiftly; and where the two men finally follow the third and rejoin him a couple of blocks away. It would have been poor police work indeed for an officer of 30 years' experience in the detection of thievery from stores in this same neighborhood to have failed to investigate this behavior further.[88]

Thus, the analysis is highly factual and context-specific. This Court held in *Lopez-Vazquez v. State* that under a totality of the circumstances analysis, courts may consider the following non-exhaustive factors when evaluating reasonable articulable suspicion:

[A]ctivity such as "leaving the scene upon the approach, or the sighting, of a police officer" or the "refusal to cooperate with an officer who initiates an encounter" cannot be the sole grounds constituting reasonable suspicion. These events, however, may be considered as part of the totality of the circumstances. Other circumstances may also be considered, such as the presence of a defendant in a high crime area, the defendant's "unprovoked, headlong flight," a defendant "holding a bulge in his pocket that appeared to be either a gun or a large quantity of drugs", a "focused" warning shout of police presence, or a furtive gesture after the officer's approach or display of authority. The officer's subjective interpretations and explanations of why these activities, based on experience and training, may have given him a reasonable suspicion to investigate further are also important, as is the trial judge's evaluation of the officer's credibility.[89]

But *Terry* stops do not give officers carte blanche to indulge their hunches. "The Fourth Amendment 'does not allow the law enforcement official to simply assert that apparently innocent conduct was suspicious to him or her; rather the officer must offer the factual

---

[88] *Id.* at 22–23.

[89] *Lopez-Vazquez*, 956 A.2d at 1288–89 (citations and quotations omitted).

basis upon which he or she bases the conclusion.'"[90]

B. *Delaware Case Law Indicates Officers Did Not Have Reasonable Articulable Suspicion*

This Court has never found reasonable articulable suspicion when the articulated facts are as thin as in the present case. Cases where this Court has found reasonable suspicion have included additional articulated facts not presented here such as support from an ongoing investigation, suspects not purchasing anything at the location, events occurring at night, or unusual specific behaviors tied to drug transactions in a specific area. Further, the records in this Court's cases upholding a finding of reasonable articulable suspicion have all included officer testimony that articulated why certain observed behavior caused the officer to reasonably suspect that a suspect was committing, had committed, or was about to commit a crime. By contrast, the testimony here provided nothing more than the reasoning supporting officers' hunch that criminal activity was afoot.

To start, I disagree with the Majority's characterization of *Hudson v. State*[91] as supporting reasonable articulable suspicion in the present case. *Hudson* presented stronger facts supporting a finding of reasonable suspicion, and the *Hudson* detective's testimony articulated those facts in specific detail absent in the present case.

The *Hudson* events originated in the context of an ongoing investigation into a particular target backed by a confidential tip. As part of this ongoing investigation, officers

---

[90] *Harris v. State*, 806 A.2d 119, 128–29 (Del. 2002) (quoting *Cartnail v. State*, 753 A.2d 519, 531 (Md. 2000)). This language was also quoted by the Superior Court during the suppression hearing. App. to Opening Br. at A105–06 (Motion to Suppress Hearing Trans.).

[91] *Hudson v. State*, 23 A.3d 865, 2011 WL 2651089, at *1 (Del. Jul. 6, 2011) (TABLE).

knew that their target sold heroin in specific packaging, would often meet people outside of Wilmington, and was operating a Nissan. And during the events leading to Hudson's arrest, the officers observed their particular target follow this *modus operandi*. Before detaining Hudson, the officers observed their target Nissan enter a gas station parking lot, followed by a Buick. An individual exited the Buick, entered the Nissan, and shortly thereafter reentered the Buick. The vehicles exited the parking lot and travelled in separate directions without purchasing gas or anything from the store. The officers lost sight of the Nissan but followed the Buick to a second gas station, where the defendant exited the vehicle, entered the store at the gas station for less than a minute, then returned to the vehicle. Only after observing this series of events did the officers stop the individuals in the Buick.

At the *Hudson* suppression hearing, the detective provided detailed testimony articulating why the facts that led to Hudson's detention provided reasonable articulable suspicion of illegal drug activity. The detective's testimony relied on her expertise and discussed how several facts present in the case would lead an experienced officer to be suspicious that drug activity was afoot. Not only did the detective mention the movement patterns of people, but she also testified how the movement patterns of the vehicles and the lack of any store or gas purchases were indicative of a drug transaction.[92]

---

[92] *Id.* at *2. The detective testified as follows:

> Typical meet would be probable telephone communications as to a meet location. The vehicle would get there first, await for the arriving vehicle. The person who is selling the drugs usually would get out, maybe get in that person's vehicle, or the drug user would get out, get into another person's vehicle. It would be a brief conversation. Sometimes you can see if you are close enough, sometimes you can't.

I respectfully disagree with the Majority that *Hudson* supports finding reasonable articulable suspicion in the present case because the *Hudson* events differ significantly from those in the present case. The *Hudson* officers were relying on known patterns from an ongoing investigation – they knew the *modus operandi* of their particular target and observed actions consistent with that *modus operandi*. Here, Detective Randazzo and his team were not relying on known patterns, confidential tips, or controlled buy information from an ongoing investigation;[93] rather, they were observing an individual from a previous investigation. Further, that individual, Lopez, was "apparently getting gas"[94] unlike the individuals in *Hudson* who did not get gas or purchase anything. This is particularly important as courts have considered store or gas purchases in the reasonable suspicion

> They kind of pull off to the side. They wouldn't go—wouldn't get gas, wouldn't go in a store to purchase an item. Sometimes maybe they go to the store afterwards, in this case not. Then the two would go back to their separate vehicles and go their separate ways.

*Id.*

[93] App. to Opening Br. at A59 (Randazzo. Test. at 37:10–20)

> Q: Okay. And you talked before about how part of your training and experience, you learned about controlled purchases; correct?
>
> A: Yes.
>
> Q: Using confidential informants; correct?
>
> A: Correct.
>
> Q: That didn't happen in this case; correct?
>
> A: It did not.

[94] *State v. Register*, 2023 WL 6323594, at *1 (Del. Super. Ct. Sept. 26, 2023). The Majority gives little weight to the appearance that Lopez was getting gas, but I believe that this appearance of getting gas is critical. It is the appearance, rather than the actual getting of gas, that would be observable to the officers and weigh against finding reasonable articulable suspicion. Therefore, accepting this trial court factual finding as true as the Majority does with others provides an important fact weighing against reasonable articulable suspicion.

analysis,[95] and the *Hudson* trial court used this lack of a purchase to support its finding that neither vehicle had any legitimate purpose being at the location.[96]

Additionally, the detail of Detective Randazzo's testimony fell far short of the specific facts articulated by the *Hudson* detective. The *Hudson* detective articulated why the facts combined with her expertise to support reasonable articulable suspicion citing multiple factors indicative of drug transactions. In contrast, Detective Randazzo's testimony failed to show why Register's behavior was suspicious beyond the conclusory statement that it was "consistent with" a drug transaction.

Surrounding knowledge of the location also distinguishes *Hudson* from the present case. Despite the *Hudson* events taking place outside of a known drug area, there was reasonable articulable suspicion, in part, because "[t]he officers knew that the target was aware that the Wilmington Police Department 'was on to him,' so he often would meet people in his car outside of Wilmington."[97] And, as the articulated facts predicted, the

---

[95] *United States v. Scott*, 404 F. Supp. 3d 1095, 1104 (E.D. Ky. 2019) (citing *United States v. Alexander*, 528 F. App'x 515, 516, 519–20 (6th Cir. 2013); *United States v. McCoy*, 513 F.3d 405, 408, 412–13 (4th Cir. 2008)) ("In other cases where drug dealing allegedly occurred in a retail establishment's parking lot, courts took into account whether the defendant went into or purchased something from the establishment.").

[96] *Hudson*, 2011 WL 2651089, at *2 (quoting trial court).

> It was also clear that even though this took place in the middle of the afternoon, the [Nissan] was there for no other purpose, let alone any apparent legitimate purpose. The [Nissan] did not purchase gas, did not go into the store. The Buick, by the same token, was not at the gas station for any apparent legitimate purpose. Rather, its reasonable articulable suspicion that the reason the Buick arrive[d] at the [gas] station was to have contact with the known drug dealer[.]

*Id.*

[97] *Id.* at *5.

*Hudson* target did meet people in his car outside of Wilmington. In contrast, the target in the present case was not known to operate in the area of the Wawa and officers did not articulate facts showing his *modus operandi* in the area. Thus, this similarity between *Hudson* and the present case becomes illusory when viewed in the context of *Hudson*'s additional facts.

This Court's decision in *Lofland v. State*[98] shows the importance of specific knowledge and specific location in finding reasonable suspicion. In *Lofland*, this Court held that there was reasonable articulable suspicion when the investigating officer thought that the defendant's behavior was consistent with drug activity because of the specific behaviors and their relationship with how drug deals were conducted in that specific neighborhood.[99] This behavior included the defendant and another individual standing "by the passenger side of a white minivan on Bowers Street, a well-known drug area in Wilmington, Delaware. One of the men was leaning inside the van."[100] But there was more than just a person leaning into a minivan. When explaining why the behavior was suspicious, the officer pointed out that this behavior was characteristic of "the way it's done in Riverside."[101] This Court held that this specific knowledge of how drug deals were done in that specific neighborhood created the necessary reasonable articulable suspicion

---

[98] *Lofland v. State*, 834 A.2d 826, 2003 WL 22317402 (Del. Oct. 7, 2003) (TABLE).

[99] *Id.*, at *1 (the officer testified that "[t]hey have what they call touters out there in Riverside. What happens is that the touters approach the vehicle, find out what the people want, go out into the courtyards to get from the dealer—that's the way it's done in Riverside.").

[100] *Id.*

[101] *Id.*

to stop the defendant.

Here, this specific knowledge in a specific neighborhood is absent. Although Detective Randazzo testified that Lopez usually dealt drugs in convenience stores, he did not testify that the hand-to-hand interaction was characteristic of drug deals in the neighborhood where the Wawa was located. Indeed, this Wawa was not a known or suspected location of such activity.

Finding other factors to support reasonable suspicion is particularly important when the observed behavior is typically innocent. Here, Detective Randazzo testified that a conversation prior to an interaction is "consistent with" a drug transaction.[102] But this is also "consistent with" innocent behavior – indeed, conversing with an individual is often a prerequisite to engaging in a subsequent interaction. Therefore, other factors, potentially including that the behavior is characteristic of illegal activities in the specific neighborhood, are necessary to establish reasonable articulable suspicion that innocent-appearing behavior is not innocent. But Detective Randazzo's testimony did not provide such factors and did not show why a conversation preceding an interaction in this neighborhood is indicative of a drug transaction. Rather than pointing to specific articulable facts, Detective Randazzo's testimony was conclusory – that is, unsupported by evidence – in finding that the conversation and subsequent interaction were "consistent with" a drug transaction.[103] Thus, this lack of specific articulable facts, particularly as

---

[102] App. to Opening Br. at A77–78 (Randazzo Test. at 55:16–56:2).

[103] Detective Randazzo testified that the interaction was consistent with a drug transaction because "there's obviously a conversation of, you know, whatever is agreed upon, and then the interaction occurs." *Id.* However, Detective Randazzo also acknowledged that he did not hear the

24

regarding location-specific facts, distinguishes this case from *Lofland*.

The present case is also distinguishable from *Hall v. State*, where this Court found reasonable articulable suspicion.[104] In *Hall*, the detective was in a 7-Eleven parking lot at 11:00 P.M. when he saw the defendant exit his car, walk into the convenience store for a few minutes and return to his car. Then another car parked to the side of the store despite available parking in front. The defendant exited his car and entered the back seat of the second car – behavior the detective determined was indicative of drug sales. This Court concluded that this was enough to support a finding of reasonable articulable suspicion of drug sales given the detective's knowledge of how local drug transactions were conducted along Kirkwood Highway in Newark.

Four key factors distinguish *Hall* from this case. *First*, Detective Randazzo's observation of Register took place in broad daylight whereas the *Hall* detective observed the activities at night. *Second*, Lopez parked at a gas pump and was "apparently getting gas"[105] whereas the other car in *Hall* parked in an out-of-the-way location despite more convenient parking being available. *Third*, Register's interaction occurred at a Wawa not known for drug activity but, in *Hall*, "Detective Simpler was surveying the 7–Eleven parking lot as it was known to have a high level of drug activity."[106] And *fourth*, the *Hall* detective's testimony regarding his "knowledge of the way drug transactions are done in

---

conversation. *Id.* at A40 (Randazzo Test. at 18:2–6). Therefore, it would be unreasonable for this Court to assume what, if anything, was agreed upon.

[104] *Hall v. State*, 981 A.2d 1106, 1112–13 (Del. 2009).

[105] *State v. Register*, 2023 WL 6323594, at *1 (Del. Super. Ct. Sept. 26, 2023).

[106] *Hall*, 981 A.2d at 1110 (quoting trial court).

the area"[107] articulated more specific facts than Detective Randazzo's conclusory testimony that what he observed was "consistent with" a drug transaction.

*Riley v. State*[108] and *Harris v. State*[109] both illustrate this Court's previous reluctance to credit officer experience unsupported by specific articulated facts. In *Riley*, officers were monitoring a liquor store parking lot for sales of liquor to minors. The officers saw two young women passengers in a car when another car approached. The women and the defendant conversed, during which time the officers reported they "believed they saw some type of exchange," but were unable to identify any objects.[110] The officers believed that this was a request for alcohol by underage girls or a drug transaction. This Court held that there was no reasonable articulable suspicion because:

> There was no evidence that the area was the focus of special attention because of drug sales. There was no evidence that the officers had observed a drug sale in that area before the defendant's stop. There was no evidence that the conduct observed was consistent with conduct the officers had observed in prior drug transactions. There was no evidence of any exchange of money or any other item.[111]

This Court also noted that "the police could not identify an actual object exchanged, no suspects left the scene upon observing the police, and none of the occupants of the car reacted suspiciously to the police presence before the seizure occurred."[112] The

---

[107] *Id.*

[108] 892 A.2d 370, 373 (Del. 2006).

[109] 806 A.2d 119 (Del. 2002).

[110] *Riley*, 892 A.2d at 372.

[111] *Id.* at 376.

[112] *Id.* at 377.

defendant's presence in the shopping center did not mean that a transaction was occurring just because the women turned to speak to him, or looked around the parking lot. The behavior was consistent with innocent behavior.[113] On those facts, this Court concluded that there was no reasonable articulable suspicion to detain the defendant and reversed.

As in *Riley*, Register's behavior is consistent with innocent behavior. His location at a Wawa where Detective Randazzo had made prior arrests and his proximity to a known drug suspect were factors for a hunch, but the officers could not identify whether there was an actual exchanged object, let alone what it was.

Comparing *Riley* and *Lofland* also works in Register's favor. The *Lofland* court found reasonable articulable suspicion when considering the drug presence in the neighborhood and the officer's ability to connect the otherwise innocent behavior of the defendant to behaviors characteristic of drug transactions in that neighborhood. But the *Riley* court found no reasonable articulable suspicion when the neighborhood was not known for drugs and officers did not indicate why the neighborhood would make innocent behavior suspicious.

Here, Register's situation parallels *Riley*. The Wawa where the interaction took place is not known for drug activity, and Detective Randazzo did not articulate why engaging in the innocent behavior of conversing before interacting is characteristically suspicious in this neighborhood. Detective Randazzo believed that he had observed a drug transaction but, as in *Riley*, his belief was insufficient for reasonable articulable suspicion

---

[113] *Id.* at 378.

without testimony tying specific articulated facts to illegal activity. Thus, the lack of known drug activity in the area and Detective Randazzo's conclusory testimony fail to show why the innocent behavior of conversing before interacting ripened into reasonable articulable suspicion.

The Majority also dismisses the relevance of *Harris v. State*,[114] but I believe *Harris* deserves more than this cursory treatment. In *Harris*, officers detained the defendant after he "(1) looked over his shoulder three times between leaving the train and descending the platform staircase into the station; (2) met another man in the lobby; (3) used a payphone; (4) 'popped' his head up in the backseat; and (5) looked out the rear window of the Tempo."[115] Despite officers' expertise regarding drug courier profiles, this Court wrote that "the detaining officer never explained how Harris' behavior matched the characteristics of the police's drug courier profile."[116] This Court then held that "[w]ithout a cogent explanation, Harris' seemingly innocent conduct provides no basis for a finding of reasonable suspicion even in the eyes of a reasonable, prudent, and experienced police officer."[117] Thus, this Court held that "the detaining officer's belief that Harris was a drug courier fails the test of *Reid* because it 'was more an inchoate and unparticularized suspicion or hunch than a fair inference in light of his experience [and] is simply too slender

---

[114] 806 A.2d 119 (Del. 2002).

[115] *Id.* at 129.

[116] *Id.*

[117] *Id.*

28

a reed to support the seizure in this case.'"[118]

The present case raises similar concerns about overreliance on officer hunches. Here, Detective Randazzo's testimony does not offer a cogent explanation showing why Register's seemingly innocent conduct provided a basis for reasonable articulable suspicion. Rather than pointing to area-specific facts or drug courier profiles, Detective Randazzo relied on Register's behavior being "consistent with" a drug transaction without offering further articulated detail. Officer expertise is a valuable tool, but cases like *Harris* show that expertise must be backed by specific articulated facts to support reasonable articulable suspicion. These specific articulated facts are absent in this case and, accordingly, I do not believe that the State has shown that there was reasonable articulable suspicion to detain Register.

The similarities between this case and *Lopez-Vazquez v. State*[119] further show that the State failed to establish reasonable articulable suspicion to detain Register. In *Lopez-Vazquez*, detectives were setting up surveillance during a controlled-buy investigation of a known drug suspect when an unknown individual, the defendant, arrived at the apartment complex under surveillance. The defendant spoke for fifteen minutes with a drug suspect unrelated to the ongoing investigation in front of the surveilled apartment complex. Because the men looked "nervous and anxious" a detective testified that they looked like they were waiting for someone.[120] The initial subject of the investigation tossed keys to

---

[118] *Id.* (quoting *Reid. v. Georgia*, 448 U.S. 438, 441 (1980)) (internal quotation omitted).

[119] *Lopez-Vazquez v. State*, 956 A.2d 1280, 1294 (Del. 2008).

[120] *Id.* at 1283.

the unrelated drug suspect and all three individuals eventually entered the building. A detective stopped the defendant and spoke with him when he exited the building. This Court found that there was no reasonable articulable suspicion to stop Lopez-Vazquez because he was not known or subject to the ongoing investigation; rather, he spoke to another unrelated drug suspect while looking nervous, and the person he was with then received keys from the original suspect of the investigation. There was no evidence concerning where the defendant was for the hour he was in the building until he left alone. Therefore, the nervous behavior and conversation with a known suspect gave police only a "hunch" that the defendant was involved in the ongoing investigation.[121]

Here, Register was unknown prior to the investigation and he blundered into the investigation much like Lopez-Vazquez. As with Lopez-Vazquez, Register's interaction with a drug suspect is insufficient for reasonable suspicion without more to fill the gaps. Here, there is not enough more. Officers detained Register shortly following the interaction eliminating their ability to gauge subsequent behavior. Speculation about whether an illegal hand-to-hand transaction occurred out of sight is like the speculation about where Lopez-Vasquez was in the apartment complex: it cannot fill the gaps to establish reasonable articulable suspicion.

The Majority distinguishes *Lopez-Vazquez* by finding that *Lopez-Vazquez* lacked a

---

[121] *Id.* at 1291 (stating that "[n]othing in the record, however, provides concrete reasons why the remainder of the wholly innocent events that occurred before the seizure (for example, entering into a multi-unit apartment building after Hernandez, spotting Lopez–Vazquez outside of the building—and alone—an hour later by himself) combine into a 'suspicious conglomeration' which supports a *Terry* stop.").

specific set of facts for reasonable articulable suspicion. While I agree that *Lopez-Vazquez* lacked these specific facts, I disagree that this case has them. In *Lopez-Vazquez* and the present case, the defendants interacted with a drug suspect with Lopez-Vazquez appearing nervous, while Register engaged in a hand-to-hand interaction. Both are seemingly innocent behaviors, and both involved the respective defendants interacting with a drug suspect. But given that officer testimony in this case failed to specifically articulate why Register's hand-to-hand interaction was anything more than innocent, I fail to see why this case has a specific set of facts whereas *Lopez-Vazquez* does not.

In rejecting an analogy to *Lopez-Vazquez*, the Majority also appears to reject an individualized suspicion requirement. I cannot agree with such an associational approach to limiting individuals' Fourth Amendment rights. While association with criminal suspects may be a factor in the totality of the circumstances, "[t]here is no reasonable suspicion merely by association."[122] Furthermore, facts sufficient for a hunch do not automatically rise to reasonable suspicion merely because one of the actors has a criminal background.[123] Here, Lopez's background is one factor in the totality of the circumstances analysis but I do not believe it transforms the other seemingly innocent facts into grounds for reasonable articulable suspicion.

Finally, I cannot see how finding reasonable articulable suspicion in this case is

---

[122] *United States v. Black*, 707 F.3d 531, 539 (4th Cir. 2013). *See also Smith v. United States*, 558 A.2d 312, 315 (D.C. 1989) (compiling cases) ("Courts in other jurisdictions have been faithful to *Sibron* and *Ybarra* in rejecting articulable suspicion arguments based upon guilt by association.").

[123] *See Black*, 707 F.3d at 539 (declining to find reasonable suspicion where defendant interacted with individual with prior arrest history in high-crime area at night and presented out-of-district ID).

compatible with this Court's recent decision in *McDougal v. State*.[124]  In *McDougal*, the

majority held that the State failed to show reasonable articulable suspicion that the

defendant was violating a loitering statute even where:

- McDougal was "blocking pedestrian traffic" by "standing idle" "in front of the house" at 24th and Carter;

- McDougal, unknown to the police, was with two individuals known not to live at that address;

- Officers were investigating a tip by a confidential informant which indicated that McDougal's companions and two other individuals used ground stashes in this area to hide drugs and guns;

- Prior to receiving that tip, officers stopped the other two individuals identified by the confidential informant around the area of 24th and Carter and "located a discarded firearm behind a trash can;"

- 24th and Carter was in a "high crime" area;

- McDougal was dressed in baggy and multiple-layered clothing, inappropriate for the season, which was a characteristic known from police training and experience to indicate possession of a weapon (for example, by hiding the "print" of a gun).[125]

The majority held that when the officers detained the defendant, the defendant "had

done nothing more than stand on a street corner while purportedly wearing baggy

clothes."[126]  Here, when the officers detained Register, Register had done nothing more

than have a conversation with and extend his hand towards an alleged drug dealer in a high

crime area.  Unlike the *McDougal* officers, the officers who detained Register had received

---

[124] 314 A.3d 1077 (Del. 2024).

[125] *Id.* at 1103–04 (Valihura, J., dissenting).

[126] *Id.* at 1089.

no informant tips, had found no guns, and had not observed Register blocking pedestrian traffic. Thus, I respectfully disagree that there can be reasonable articulable suspicion to detain Register when it did not exist to detain McDougal.

My analysis persuades me that Delaware case law indicates that the State failed to show that Register's lawful behavior created reasonable articulable suspicion of unlawful behavior. Below, I consider the points raised by the Majority and look to similar cases from other jurisdictions for additional guidance. I conclude that case law from other state and federal courts aligns with Delaware case law in showing that the officers in this case lacked reasonable articulable suspicion. Accordingly, I believe that Register's detention was unlawful, and evidence and statements derived from that detention should have been suppressed.

### C. The State Failed to Offer a Sufficient Factual Basis to Support Reasonable Articulable Suspicion

I take issue with four main parts of the Majority's argument. *First*, I disagree with the Majority's deference to officer experience when officer testimony failed to articulate suspicious objective facts. *Second*, I disagree that the facts apparent to the officers showed anything more than innocent conduct. *Third*, I disagree with the Majority's argument that these innocent facts rise to reasonable articulable suspicion due to Lopez's background. And *fourth*, after considering the totality of the circumstances and comparing this case to others with similar facts, I cannot agree with the Majority that combining the innocent facts of this case creates the reasonable articulable suspicion necessary to lawfully detain Register.

33

*1. The Officers' Bare Assertions Were Insufficient to Establish Reasonable Articulable Suspicion*

Inherent in "reasonable articulable suspicion" is the requirement that the reasons for suspicion be articulable. *Terry* shows this requirement by stating that "in justifying the particular intrusion the police officer must be able to point to *specific and articulable facts* which, taken together with rational inferences from those facts, reasonably warrant that intrusion."[127] Indeed, "[t]his demand for specificity in the information upon which police action is predicated is the central teaching of [the United States Supreme Court's] Fourth Amendment jurisprudence."[128] In accordance with this requirement, the Third Circuit has observed that, although it does not "lightly second guess the decisions made by police officers in the field,"[129] there are limits "to how far police training and experience can go towards finding latent criminality in innocent acts."[130]

In a concurrence in *United States v. Drakeford*, Judge Wynn of the Fourth Circuit discussed why courts should demand articulated facts from experienced officers in reasonable suspicion cases.[131] In *Drakeford*, officers detained an individual after seeing him engage in behavior "consistent with" hand-to-hand drug transactions.[132] However, the officers observed no money, drugs, or weapons, and failed to articulate why this behavior

---

[127] *Terry v. Ohio*, 392 U.S. 1, 21 (1968) (emphasis added).

[128] *Id.* at 21 n.18.

[129] *Johnson v. Campbell*, 332 F.3d 199, 205 (3d Cir. 2003).

[130] *Id.* at 208.

[131] *United States v. Drakeford*, 992 F.3d 255, 266–67 (4th Cir. 2021) (Wynn, J., concurring).

[132] *Id.* at 258; *id.* at 266 (Wynn, J., concurring).

pointed to a hand-to-hand drug transaction rather than a transaction of legal goods or a handshake.[133]

The *Drakeford* officers were experienced regarding hand-to-hand drug transactions but Judge Wynn wrote skeptically of using this experience to support reasonable suspicion without other articulated facts. Judge Wynn found the officer testimony provided "thin facts—the handshake appeared long and purposeful—bolstered by a thinner interpretation of those facts—the handshake was 'consistent with' a drug transaction."[134]

Here, the officers failed to articulate more than bare assertions. The officers repeatedly emphasized that the hand-to-hand interaction was "consistent with" a drug transaction. The trouble is that the officers failed to articulate facts showing why this behavior was indicative of a drug transaction rather than any manner of legal behavior. Instead, the trial court allowed the officers' experience to fill the factual gap. This was insufficient in *Drakeford*, and it is insufficient here.

Courts have long considered officer experience as part of the reasonable suspicion analysis, but this is because of the ability of experienced officers to notice and articulate suspicious behaviors that untrained individuals may not perceive – not because experience gives deference to officers' hunches. Here, I agree that the behaviors are "consistent with" a drug transaction; however, they are also "consistent with" any manner of legal goods being exchanged or, as Detective Randazzo conceded in his testimony, "consistent with" a

---

[133] *Id.* at 258.

[134] *Id.* at 266 (Wynn, J., concurring).

handshake. The officers' failure to articulate supporting objective facts leaves this Court to rely on experienced hunches – a ground not recognized as sufficient to detain an individual under the Fourth Amendment.[135]

Officer experience is undoubtedly valuable in ferreting out crime, but it is no substitute for objective articulated facts. Were it otherwise, sufficiently experienced officers could point to their experience to turn any hunch into the detention of any individual. But the Fourth Amendment is not satisfied by hunches and, accordingly, it is not satisfied here.

2. *The Facts Presented Fail to Articulate Register's Involvement in Criminal Activity*

I believe that the totality of the circumstances shows that officers were closer to a hunch than reasonable articulable suspicion. To begin with, Register was not previously known to police and he "blundered into an ongoing criminal surveillance of an unrelated suspect."[136] The officers testified that they saw a "hand-to-hand" transaction and that Register's behavior was "consistent with" a drug transaction. However, cross-examination revealed that this was nothing more than a hunch as the officers saw no objects exchanged and saw no movement by Register to place objects in his hands or pockets. But rather than

---

[135] *See Ford v. State*, 158 S.W.3d 488, 493 (Tex. Crim. App. 2005)

> Allowing a police officer's opinion to suffice in specific facts' stead eviscerates *Terry*'s reasonable suspicion protection. If this Court were to hold as the dissent suggests, we would be removing the "reasonable" from reasonable suspicion. Therefore, we adhere to the principle that specific, articulable facts are required to provide a basis for finding reasonable suspicion.

[136] *Register*, 2023 WL 6323594, at *1.

investigate further, officers swooped in and detained Register.

The Majority finds reasonable articulable suspicion by noting that the interaction occurred in a high crime area, Lopez reached under the vehicle's seat, and drug dealers may engage in brief hand-to-hand transactions. The Majority uses these circumstances to find Lopez and Register's interactions suspicious noting that Lopez and Register had a brief conversation and engaged in hand-to-hand contact.

But in a totality of the circumstances analysis, what the officers did not see is as important as what they did see. Here, the officers did not see critical parts of the alleged transaction, nor did they see the sort of actions that would corroborate their hunch. In their testimony, the officers noted that they could not conclusively see whether Lopez was pumping gas or what, if anything, Lopez retrieved from the vehicle.[137] And they further testified that they could not see Lopez or Register's hands during the alleged exchange; nor could they see if Register placed anything in his pockets or bags.[138]

Courts have been skeptical of finding reasonable suspicion in similar cases where officers witnessed hand-to-hand contact in high crime areas but could not testify to the

---

[137] *Id.* ("In any event, the suspect under surveillance was in a Wawa store parking lot, apparently getting gas."); App. to Opening Br. at A38 (Randazzo Test. at 16:11–16); App. to Opening Br. at A41 (Randazzo Test. at 19:21–23) ("Q: And you testified you couldn't see what that was? A: I could not see what that was."); App. to Opening Br. at A65 (Randazzo Test. at 43:7–11, 43:21–23) ("Q: Could you see what he was reaching for? A: I had already said I wasn't able to see what was obtained, but he's reaching under his seat. . . Q: So you could not see his hands; correct? A: No."); App. to Opening Br. at A66 (Randazzo Test. at 44:1–3) ("Q: And you did not actually see what he took out of that driver seat? A: Correct.").

[138] App. to Opening Br. at A91–92 (Guarino Test. at 69:21–70:10) (acknowledging "there was cars and stuff that were blocking [his] view" but responding that he did not "ever observe Mr. Register place anything in his bag" and he did not "ever see [Register] place anything in his pockets[.]").

37

objects allegedly being exchanged. In *United States v. Kitchen*, the Ninth Circuit held there was no reasonable suspicion when officers patrolling a high crime neighborhood at night witnessed hand-to-hand contact between two individuals who put their hands in their pockets and walked away after seeing the patrol car.[139] And in *Patterson v. City of Cleveland*, the Sixth Circuit held there was no reasonable suspicion when an officer patrolling a high crime area observed an individual "involved in some type of exchange" who put his hands in his pockets and departed after a police vehicle arrived.[140]

I believe that the observation of something being exchanged is important. Even assuming the interaction was something other than a handshake or fist bump, exchanging items at a gas station is hardly illegal. The object exchanged could have been any manner of legal items such as a vape – which Lopez told officers he gave Register – or candy – which was found in Register's possession. Further, the facts of this interaction make it less suspicious than those from *Kitchen* and *Patterson* where reasonable suspicion was absent. Those cases included factors such as the interactions taking place at night, suspects placing their hands in their pockets, and suspects leaving after police arrived.[141] Putting one's hands in one's pockets would be a natural move to store contraband after an illicit transaction but the officers observed no such activity from Register. Nor did Register

---

[139] *United States v. Kitchen*, 11 F. App'x 844, 845–46 (9th Cir. 2001). As is the case here, the *Kitchen* officers did not see whether the two individuals exchanged anything. *Id.* at 846.

[140] *Patterson v. City of Cleveland*, 173 F.3d 429, 1999 WL 68576, at *1 (6th Cir. Jan. 21, 1999) (TABLE).

[141] *See also United States v. Paulette*, 457 F.3d 601 (6th Cir. 2006) (defendant's movement of hand toward pockets and avoidance of officers supported reasonable suspicion following appearance of hand-to-hand drug transaction).

attempt to evade officers after the interaction.[142]  And the events occurred in broad daylight in an area with surveillance cameras.[143]

The reasonable articulable suspicion analysis must also take account of countervailing facts as "[t]he presence of additional facts might dispel reasonable suspicion[.]"[144]  Here, officers did not observe Register storing objects in his hands or pockets and Lopez was "apparently getting gas"[145] – both activities supporting innocent alternatives for the interaction at the Wawa.  "In other cases where drug dealing allegedly occurred in a retail establishment's parking lot, courts took into account whether the defendant went into or purchased something from the establishment."[146]  In *United States v. Alexander*, the Sixth Circuit supported its reasonable suspicion finding, noting that the defendant did not purchase gas despite parking next to a gas pump.[147]  Similarly, the Fourth Circuit supported a reasonable suspicion finding noting that the defendant visited two grocery store parking lots but did not enter either store.[148]  Thus, the fact that Lopez was

---

[142] This Court has recognized flight from officers as a factor that may contribute to reasonable articulable suspicion.  *Lopez-Vazquez v. State*, 956 A.2d 1280 1288–89 (Del. 2008) (discussing several factors including defendant's unprovoked headlong flight).

[143] App. to Opening Br. at A80 (Randazzo Test. at 58:9–10); App. to Opening Br. at A56 (Randazzo Test. 34:16–18) ("Q:  There is Wawa surveillance at that location, is there not?  A:  I believe there is, yes.").

[144] *Kansas v. Glover*, 589 U.S. 376, 386 (2020).

[145] *State v. Register*, 2023 WL 6323594, at *1 (Del. Super. Ct. Sept. 26, 2023).

[146] *United States v. Scott*, 404 F. Supp. 3d 1095, 1104 (E.D. Ky. 2019) (citing *United States v. Alexander*, 528 F. App'x 515, 516, 519–20 (6th Cir. 2013); *United States v. McCoy*, 513 F.3d 405, 408, 412–13 (4th Cir. 2008)).

[147] *Alexander*, 528 F. App'x at 516, 519–20.

[148] *McCoy*, 513 F.3d at 408, 412–13.

"apparently getting gas" serves as a countervailing fact that weighs against reasonable articulable suspicion.

This mix of speculative inferences and countervailing facts means what started as a hunch, stayed a hunch. Detective Randazzo did not articulate specific facts to support his suspicion about what he saw and his line of sight was impeded during the critical moments of the encounter. Detective Randazzo merely assumed that Lopez retrieved an object, assumed the object was contraband, and assumed that Lopez exchanged it with Register. These assumptions-upon-assumptions fail to convince me that these innocent facts add up to reasonable articulable suspicion. Therefore, I believe that this is a situation where the State "attempts to meet its *Terry* burden by patching together a set of innocent, suspicion-free facts, which cannot rationally be relied on to establish reasonable suspicion."[149]

> 3. *Lopez's Background Does Not Create Reasonable Articulable Suspicion to Detain Register on a Set of Innocent Facts*

The Majority emphasizes Lopez's suspicious background to argue that officers had reasonable articulable suspicion to detain Register. I disagree that mere association can

---

[149] *United States v. Black*, 707 F.3d 531, 539 (4th Cir. 2013) (finding lack of reasonable suspicion when defendant interacted with individual with prior arrest history in high crime area and presented out-of-district ID); *Scott*, 404 F. Supp. 3d at 1105 (finding that "the mere observation of an interaction between two people in a high drug-crime area, with no evidence other than the officer's belief that it was a drug transaction, is not sufficient to support a finding of reasonable suspicion."); *Lopez-Vazquez v. State*, 956 A.2d 1280 (Del. 2008) (declining to find reasonable articulable suspicion where defendant interacted with drug suspect while area under active surveillance for drug activity); *see also Reid v. Georgia*, 448 U.S. 438, 441 (1980) (finding no reasonable suspicion when "[t]he other circumstances describe a very large category of presumably innocent travelers, who would be subject to virtually random seizures were the Court to conclude that as little foundation as there was in this case could justify a seizure.").

carry such a burden.[150]

Courts have held that "[t]here is no reasonable suspicion merely by association."[151] "In *Sibron v. New York*,[152] the companion case to *Terry*, the police approached and searched Sibron for the sole reason that he had been observed talking to several known narcotics addicts over a period of eight hours."[153] But the court held that "[t]he inference that persons who talk to narcotics addicts are engaged in the criminal traffic in narcotics is simply not the sort of reasonable inference required to support an intrusion by the police upon an individual's personal security."[154] "This principle was reinforced in *Ybarra v. Illinois*,[155] a case involving the illegal search of a man present at a tavern in which the

---

[150] *See Joint Anti-Fascist Refugee Committee v. McGrath*, 341 U.S. 123, 178 (1951) (Douglas, J., concurring) ("[G]uilt by association [is] one of the most odious institutions of history."), *quoted in part in People v. Messano*, 232 N.E.3d 186 (N.Y. 2024) (rejecting guilt by association in reasonable suspicion context).

[151] *Black*, 707 F.3d at 539.

[152] 392 U.S. 40 (1968).

[153] *Smith v. United States*, 558 A.2d 312, 314 (D.C. 1989) (citing *Sibron*, 392 U.S. 40).

[154] *Sibron*, 392 U.S. at 62.

[155] 444 U.S. 85 (1979). In *Ybarra*, the police executed a warrant based on probable cause to search the tavern in which Ybarra happened to be present at the time the warrant was executed. In holding that the search of Ybarra violated the Fourth Amendment, the United States Supreme Court held that "a person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person." *Id.* at 91. The court further noted that "[w]here the standard is probable cause, a search or seizure of a person must be supported by probable cause particularized with respect to that person." *Id.* And the court held that "[t]he 'narrow scope' of the *Terry* exception does not permit a frisk for weapons on less than reasonable belief or suspicion directed at the person to be frisked, even though that person happens to be on premises where an authorized narcotics search is taking place." *Id.* at 94. Thus, the search of Sibron's pockets violated the Fourth Amendment because there were no adequate grounds to search him for weapons and his "mere act of talking with a number of known narcotics addicts over an eight-hour period no more gives rise to reasonable fear of life or limb on the part of the police officer than it justifies an arrest for committing a crime." *Sibron*, 392 U.S. at 64. *See also United States v. Navedo*, 694 F.3d 463, 468–69 (3d Cir. 2012) (analyzing reasonable suspicion case and noting that "[a]lthough the Court in *Ybarra* was discussing probable cause to arrest rather

police were executing a search warrant of the premises, and of the bartender who was suspected of distributing heroin."[156]

"Courts in other jurisdictions have been faithful to *Sibron* and *Ybarra* in rejecting articulable suspicion arguments based upon guilt by association."[157]  For example, in *United States v. Sprinkle*, the Fourth Circuit addressed a case where the defendant engaged in close hand-to-hand contact with another individual who "had a criminal record and had recently been released from prison after serving time for narcotics violations[.]"[158]  In declining to find reasonable suspicion, the court wrote that "Officer Riccio's curiosity was understandably aroused when he spotted [the other individual], who had recently served time for a narcotics offense, in a neighborhood with a high incidence of drug traffic.  But for these factors to support reasonable suspicion, there must be (other) particularized evidence that indicates criminal activity is afoot."[159]

This Court has also refused to find reasonable articulable suspicion merely because a defendant engaged in activities with a drug suspect.  In *Lopez-Vazquez v. State*, the defendant arrived at a location under surveillance for drug-related activities and interacted

---

than the reasonable suspicion for a stop under *Terry*, the Court's pronouncement is equally applicable to this situation.").

[156] *Smith*, 558 A.2d at 314 (citing *Ybarra*, 444 U.S. 85).

[157] *Id.* at 315 (compiling cases).

[158] *United States v. Sprinkle*, 106 F.3d 613, 617 (4th Cir. 1997).

[159] *Id.* at 618.  *See also Black*, 707 F.3d at 539 (declining to find reasonable suspicion where defendant interacted with individual with prior arrest history in high-crime area at night and presented out-of-district ID).

with a drug suspect.[160] However, this Court refused to find reasonable articulable suspicion after noting that "[t]he observed nervous behavior by an unknown person standing next to and conversing with a known drug suspect gave police a 'hunch' that the unknown person might be involved with the target of their investigation."[161]

I do not dispute that association with a known criminal may combine with other sufficiently suspicious facts to support reasonable articulable suspicion. But, as noted above, these suspicious facts are absent here and countervailing facts weigh against reasonable articulable suspicion.

My view on this factor is further supported by *Sprinkle* and *Lopez-Vazquez* having stronger links between the other individual and criminal activity than are present here. In *Sprinkle*, the other individual had been convicted and served prison time for narcotics offenses and the area in *Lopez-Vazquez* was under active surveillance for drug activity. Here, the other individual, Lopez, was merely a drug suspect and the area where the

---

[160] *Lopez-Vazquez*, 956 A.2d at 1283.

[161] *Id.* at 1291. This Court also noted that the Superior Court has determined that the "automatic companion" rule has been defunct under federal law since *Ybarra v. Illinois*, 444 U.S. 85 (1979), but that this Court would not decide this issue because it was not asked to do so. *Lopez-Vazquez*, 956 A.2d at 1291 n.34 (citing *State v. Henderson*, 906 A.2d 232, 236–37 (Del. Super. Ct. 2005), *aff'd on alternate grounds*, 892 A.2d 1061, 1066 (Del. 2006)). In affirming *Henderson*, this Court wrote:

> The police never before witnessed Henderson in the presence of Jones in any other situation, and therefore could not reasonably conclude that Henderson was connected to Jones's alleged drug business. We cannot hold that simply accompanying another person reasonably suspected of having committed felony drug charges, without anything more gives rise to a reasonable articulable suspicion that the companion is presently armed and dangerous.

*Henderson*, 892 A.2d at 1066.

interaction occurred was not known for drug activity. Thus, if guilt by association is too tenuous in *Sprinkle* and *Lopez-Vazquez*, it is certainly too tenuous here.

Nor do I believe that combining Register's association with the innocent facts above creates reasonable articulable suspicion. In the next section, I review several cases where courts have looked at similar combinations of facts and declined to find reasonable suspicion. I believe these cases are persuasive and, accordingly, I would decline to find reasonable articulable suspicion in the present case.

*4. Combining These Facts Does Not Create Reasonable Articulable Suspicion*

The Majority holds that, when combined, the facts of this case support reasonable articulable suspicion. But my analysis of the case law leads me to the opposite conclusion.

This Court has declined to find reasonable articulable suspicion merely because there are some additional suspicious circumstances when an individual meets with a drug suspect[162] or engages in parking lot interactions.[163] However, this Court has not addressed a case with the same combination of facts as presented here. Thus, I believe that case law from other jurisdictions is enlightening.

To begin with, the Pennsylvania Supreme Court considered a similar fact pattern and declined to find reasonable suspicion. In *Commonwealth v. Greber*, the court held there was no reasonable suspicion when officers surveilling a high crime area observed a vehicle hand off a package to an individual who sniffed it and then produced what may

---

[162] *Lopez-Vazquez*, 956 A.2d at 1283.

[163] *Riley v. State*, 892 A.2d 370 (Del. 2006).

44

have been cash.[164]  The court wrote that "'(e)very commercial transaction between citizens on a street corner when unidentified property is involved does not give rise to probable cause for an arrest.'  This statement applies equally to this situation.  The facts here do not give rise to a reasonable conclusion that criminal activity was afoot."[165]  The court went on to note that while the officer "might have had a hunch that illegal contraband was involved, that is not sufficient."[166]  Among the other factors the court considered were that this was "one isolated transaction, not a series of transactions which, under certain circumstances might indicate that an exchange of drugs was taking place[]" and that the officer "had no prior information that a drug transaction would occur on this evening."[167]

Here, Register's interaction was also a single event and the officers had no prior information that a drug transaction would occur.  Further, Register's interaction was arguably less suspicious than the *Greber* interaction as officers never observed Register receiving a package – much less sniffing one – and Register's interaction occurred during the daytime.

In *United States v. Harris*, the Seventh Circuit first observed that the combination

---

[164] *Commonwealth v. Greber*, 385 A.2d 1313, 1315 (Pa. 1978).  The *Greber* parties disputed whether the seizure was an arrest requiring probable cause or whether it was not an arrest and only required the reasonable suspicion of a *Terry* stop. *Id.* at 1316.  The court declined to apply the *Terry* rationale but wrote that even if it did "apply this rationale to the present case, the police conduct here would remain unlawful because the record satisfies us that these police officers did not observe any unusual conduct. As correctly noted by the suppression court, the officer in question simply 'assumed' that criminal conduct was occurring." *Id.*

[165] *Id.* at 1316 (quoting *Commonwealth v. Lawson*, 309 A.2d 391, 394 (Pa. 1973)).

[166] *Id.* (citing *Terry v. Ohio*, 392 U.S. 1 (1968)).

[167] *Id.*

45

of three facts – the defendant being in a high crime area, wearing a long leather coat that could be used to hide a weapon, and engaging in a hand-to-hand exchange – was insufficient to establish reasonable suspicion.[168] The court also rejected the argument that the officer's experience and training "would take this exchange out of the realm of innocent behavior[]" and quoted the Third Circuit "noting that there are limits 'to how far police training and experience can go towards finding latent criminality in innocent acts[.]'"[169] The *Harris* court ultimately held that there was reasonable suspicion but wrote it only existed because the defendant attempted to walk away and refused to stop even after the officers ordered him to halt.[170]

The Fourth Circuit provides a couple of cases that I consider persuasive. In *United States v. Drakeford* – partially discussed above – the court dealt with a set of similar facts and declined to find reasonable suspicion. In *Drakeford*, the officer witnessed two handshakes between the defendant and another individual in a parking lot. The officer testified that he "believed [the second handshake] to be a hand-to-hand narcotics transaction."[171] The officer supported this by testifying that "there was an exchange of narcotics for money or just an exchange of narcotics just based on the mannerisms of that

---

[168] *United States v. Harris*, 188 F. App'x 498 (7th Cir. 2006).

[169] *Id.* at 501 (quoting *Johnson v. Campbell*, 332 F.3d 199, 208 (3d Cir. 2003)).

[170] *Id.* at 501–02. The facts concerning the defendant's refusal to stop are not present here. Therefore, this issue is not before this Court and deciding it would be irrelevant to the outcome in the present case.

[171] *Drakeford*, 992 F.3d at 260.

action."[172] However, "on cross-examination, when specifically asked if he saw drugs or money exchange hands, Detective Murphy testified that it was just the actions and mannerisms that indicated to him that it was a drug transaction. He did not actually see drugs exchanged. Nor did he see money exchanged."[173] The officer "provided no further detail about why this second handshake led him to conclude that a hand-to-hand drug transaction had occurred[]"[174] and supported his suspicion by noting that the "first interaction was brief[]" and "[t]he second, what I believe to be the hand-to-hand transaction, was more deliberate and it wasn't as brief as the first action."[175]

The court declined to find reasonable suspicion on these facts noting that the officer "never provided more than this conclusory testimony."[176] The court emphasized that the officer "never witnessed drugs or money change hands, and his testimony did not provide any details about the handshake that allows us to view this second handshake as suspicious."[177] The court concluded this part of its analysis writing:

> we cannot hold that officers' bare suspicion of drug trafficking -- without more -- can allow even an experienced officer to reasonably conclude that such a benign and common gesture can be viewed as an exchange of drugs. This cannot amount to reasonable, particularized suspicion. The Fourth Amendment does not allow the Government to label a person as a drug dealer and then view all of their actions through that lens.[178]

---

[172] *Id.*

[173] *Id.*

[174] *Id.*

[175] *Id.*

[176] *Id.* at 264.

[177] *Id.*

[178] *Id.*

The officer testimony in the present case is similarly conclusory. Here, Detective Randazzo testified that Register's interaction was "consistent with" a drug transaction but, as with the *Drakeford* officer, he conceded on cross-examination that he could not see whether anything changed hands. Detective Randazzo also pointed to the brief conversation between Lopez and Register but acknowledged that he could not hear what was said. The lack of substantive knowledge of the conversation parallels the brief conversation between the *Drakeford* handshakes which was insufficient for reasonable suspicion.

The *Drakeford* court further considered several factors that could dispel reasonable suspicion. These facts included:

> (1) officers did not witness a drug transaction either time they observed Appellant at a gas station; (2) officers did not locate drugs in the white pickup truck they followed; (3) Appellant and the two men entered the Car Stereo Warehouse and shopped for a car stereo; (4) the alleged transaction occurred in broad daylight in a public parking lot; (5) the alleged transaction occurred directly in front of a security camera; (6) no officer saw either drugs or money exchange hands during the alleged transaction.[179]

Similar countervailing facts exist in the present case. Here, the officers never located drugs, Lopez was "apparently getting gas[,]"[180] the interaction occurred in broad daylight, it took place in an area with security cameras, and no officer saw either drugs or money exchange hands during the alleged transaction.

*Drakeford* further weighs against finding reasonable articulable suspicion in the

---

[179] *Id.* at 263.

[180] *State v. Register*, 2023 WL 6323594, at *1 (Del. Super. Ct. Sept. 26, 2023).

48

present case because its surrounding facts were more suspicious than those presented here. Drakeford was already under surveillance for drug activity, officers relied on a confidential informant, and officers had located possible drug usage supplies in the vehicle of a person who recently interacted with the defendant.[181]  In contrast, Register was previously unknown to the officers and they had no prior reasons to suspect him of criminal activity.

The Fourth Circuit also declined to find reasonable suspicion in another case where a similar combination of facts existed.  In *United States v. Sprinkle*,[182] the government argued that five facts supported reasonable suspicion of defendant Sprinkle:

> (1) Officer Riccio knew that Poindexter had a criminal record and had recently been released from prison after serving time for narcotics violations, (2) the subjects were spotted in a neighborhood known by the officers for high (narcotics) crime, (3) when Sprinkle entered the Cougar, he and Poindexter huddled toward the center console with their hands close together, (4) as Officer Riccio walked past the car, Poindexter put his head down and his hand up to his face as if to avoid recognition, and (5) Poindexter drove away as soon as the officers walked by the car.[183]

But, as in *Drakeford*, the court noted several countervailing facts including that "as Officer Riccio walked by, he could see into the car and see the hands of both men:  he saw no drugs, no money, no weapons and no drug paraphernalia.  Nor did he see either man try to conceal any object."[184]  After considering the totality of the circumstances, the court concluded "that the five factors cited by the government gain little, if any, strength when

---

[181] *Drakeford*, 992 F.3d at 263.

[182] 106 F.3d 613 (4th Cir. 1997).

[183] *Id.* at 617.

[184] *Id.*

put together. Together, they did not give the officers the necessary reasonable, articulable suspicion of criminal activity."[185]

Register's interaction with Lopez shared many of these factors including Register interacting with an individual with a narcotics background, the interaction occurring in a high crime area, and close contact of hands in the interaction. But as with *Sprinkle*, these factors provided the bare suspicion necessary for a hunch – not the objective articulable facts necessary for reasonable suspicion. The factual similarities between *Drakeford*, *Sprinkle*, and the present case lead me to consider these Fourth Circuit opinions persuasive. Accordingly, I conclude that combining the innocent factors of the present case does not create the reasonable articulable suspicion necessary to detain Register.

## V. CONCLUSION

For the foregoing reasons, I believe that Register's detention was unlawful, the fruits of the detention should be suppressed, and this case should be reversed. I respectfully dissent.

---

[185] *Id.* at 618.